Joel **FISHER**, Plaintiff,
and
**District of Columbia, Intervenor-Plaintiff,**

v.

**BELL HELICOPTER COMPANY
et al., Defendants.**

**Civ. A. No. 74–1089.**

United States District Court,
District of Columbia.

Nov. 4, 1975.

Harry W. Goldberg, Washington, D. C., for plaintiff Joel Fisher.

Martin L. Grossman, Asst. Corp. Counsel, Washington, D. C., for intervenor-plaintiff District of Columbia.

William J. Donnelly, Jr., Washington, D. C., for defendants Bell Helicopter Co. and AVCO-Lycoming Corp.

James A. Welch, Wheaton, Md., for defendant Saguaro Aviation Corp.

MEMORANDUM RE LIABILITY

GESELL, District Judge.

This is a civil action arising out of a helicopter crash. Negligence and breach of contract and warranty are alleged. All issues of liability were separated from the determination of damages and tried to the Court without a jury. After a full trial the Court now sets out its findings of fact and conclusions of law.

I. FACTS

On April 5, 1973, Juneau III, a helicopter then owned by the District of Columbia ("District") and operated by its Metropolitan Police Department, crashed while on routine patrol because the engine failed. The aircraft was being properly operated at the time and there were no unusual conditions affecting its flight. Plaintiff Fisher, who suffered injuries, was one of two police officers assigned to the flight. The helicopter was manufactured and had been sold to the District by Bell Helicopter Company ("Bell"). It was equipped with an Avco-Lycoming Corporation ("Avco") engine. Saguaro Aviation Corporation ("Saguaro"), the third defendant, is an independent contractor that performed the last major engine overhaul some eleven months before the crash.

The engine in Juneau III was model VO540–B1B3, Serial No. SN 2247–43, a six-cylinder/vertical opposed reciprocating gasoline-powered type. This type of engine had been certified as airworthy by the Federal Aviation Administration ("FAA") in December, 1960. The engine failed because one of the two bolts used to clamp the connecting rod of the sixth cylinder to the crankshaft parted, which in turn caused the rod to shatter as it blasted a hole in the side of the engine. When the engine failed the helicopter was not airworthy and should have been grounded because, contrary to a mandatory FAA air directive, the connecting rods were not bolted with shot-peened bolts and the bearings were not chrome backed. This situation resulted from a complex series of events which will be outlined.

Juneau III was initially obtained by the District for police use under a lease-purchase agreement with Bell dated June 22, 1971. While this agreement was in effect Bell was responsible for all maintenance on both the engine and airframe. Two other helicopters of the same model were leased by Bell to the District at the same time and Bell placed its FAA-qualified mechanics at police facilities in the District where most maintenance work, other than major overhaul, was done. Juneau III was kept on regular police air patrol from the outset.

In May, 1972, a major overhaul of the engine was required under the then-standard maintenance schedule and the engine was shipped to Saguaro at Bell's instance for this work. Saguaro overhauled the engine and completed the job on May 10, 1972. The overhaul required, among other things, that the connecting rods and bearings be replaced. Saguaro used connecting rod assemblies ordered by it from Bell which were sent to it by Avco on Bell's order. The assemblies, designated #77450, including the one placed at the sixth cylinder, had bolts that were not shot-peened. Of the twelve bolts required for all the cylinders, only two were shot-peened. Bearings which were not chrome backed were also used. The engine was promptly reinstalled in Juneau III and operations by the District resumed.

On November 4, 1972, the District exercised its right to purchase under the lease-purchase agreement and became the owner as well as the operator of the helicopter. Thereafter the District's maintenance mechanics performed all maintenance work and Bell was relieved of maintenance responsibility. The District's mechanics were also FAA rated and, in fact, two former Bell mechanics stayed on as employees of the District to help carry on this work.

Avco issues service bulletins from time to time to alert customers and users

of its engines to new improvements and recommended operating procedures. These service bulletins are kept at maintenance facilities and are relied on by mechanics and operators. During the term of the lease, Bell had been obligated to maintain the engine so that it was always in compliance with applicable Avco service bulletins as well as FAA directives. After the purchase by the District, all pertinent service bulletins, manuals, operating instructions, FAA regulations and similar data were kept readily available to mechanics at the District's police facility, including flight logs and records of past overhaul and maintenance work.

On May 26, 1972, immediately after the major overhaul by Saguaro, Avco's service bulletin 303B issued. It covered certain VO540 helicopter engines and extended the recommended time between ovrhauls from 900 hours to 1200 hours. It also recommended that a #77450 rod assembly with shot-peened bolts be installed in all engines having 550 hours within the next 50 hours, or earlier, at owner's discretion. The bulletin stated, among other things:

REASON FOR CHANGE:

The heavy reinforced connecting rod assemblies with phosphated bearing surface treatment (P/N LW–10776) to minimize galling has not shown improvement in extending connecting rod service as intended.

The use of reinforced heavy type rod P/N 77450 which does not have the phosphate treatment in conjunction with bearing inserts with chrome backing is recommended. Also, the 77450 connecting rod assemblies are furnished with improved stretch type bolts of higher hardness with the addition of surface shot-peening to improve and minimize bolt fatigue.

On August 11, 1972, and again on November 3, 1972, new Avco bulletins 303C and 303D were issued. Bulletin 303C expressly applied to the engine in Juneau III. Each bulletin contained the same language as that quoted from 303B, above, and recommended compliance within the next 50 hours on all engines having 550 hours of operating time. Both these bulletins noted that "remanufactured engines shipped February 1, 1972 and after incorporate rod assemblies 77450 and are not subject to the requirements of this bulletin."

On August 11, 1972, the engine in Juneau III had logged 134 hours and by November 3, 1972, it had logged 552. By January 20, 1973, the engine had logged 600 hours. It still had rod bolts that were not shot-peened and the bearings were not chrome backed.

On February 1, 1973, effective February 28, 1973, the connecting rod installation recommended in these prior Avco bulletins was made mandatory by FAA directive 73–5–1. This directive required that all engines that had logged 550 hours or more *must* have the new #77450 connecting rod assemblies within 50 hours. At this point Juneau III's engine had already logged 772 hours. The directive thus required the new connecting rods be installed not later than 822 hours. The engine logged 822 hours by March 15, 1973, some three weeks prior to the crash. At time of crash the engine had logged 917 hours. The rod bolts and bearings were not in compliance with the FAA directive at the time of the crash.

When the District purchased Juneau III from Bell in November, 1972, the transaction in fact involved the purchase of three helicopters, each having the same type of airframe and engine. The District did not wish to purchase at this precise moment if any of the engines was facing expensive overhaul. Commencing in August, 1972, discussions took place between the District's representatives and the Bell mechanics to determine whether any major work on any of the engines was imminent. The Bell mechanics consulted with Bell headquarters and advised that Juneau III's engine was in compliance with Service Bulletin 303C. In fact, this was not the case, as has been indicated, because ever

since the major overhaul by Saguaro, Juneau III's connecting rod bolts were not shot-peened and the bearings were not chrome backed. The engine, therefore, required new rod assemblies at time of purchase within less than 50 hours and this would have required removal of the engine and major, extensive work. When the purchase was made the District was aware of 303D but did nothing because it believed the engine had been overhauled in compliance with 303C, which was to the same effect. Later, when the mandatory directive issued in February, the District noticed from a parts sheet supplied by Saguaro after overhaul that #77450 rods had been installed at overhaul and took this as further assurance that the engine was in compliance with 303D and the FAA directive. The District failed to notice that this parts sheet also showed that the bearings were not chrome backed.

This series of errors and misunderstandings can all be traced to a failure by Avco properly to renumber its new rod assembly so that it could be distinguished from earlier rod assemblies with the same number that did not have characteristics of the type repeatedly recommended in Saguaro bulletins 303B, 303C and 303D, and finally made mandatory in February, 1973, by the FAA directive. Avco used #77450 to designate various connecting rods at least as early as November, 1971. As the rod changed, and there were several changes involving phosphate coating, tongue and grooves, bolt hardening, different bearings, shot-peening of bolts, etc., this same part number was used. The rod assemblies sent by Bell to Saguaro via Avco for the May, 1972, overhaul were designated #77450 but they did not have shot-peened bolts. The parts sheet accompanying the engine after overhaul and kept in the District's maintenance records for the engine showed a #77450 rod assembly. A licensed FAA mechanic, relying on this #77450 designation, would be misled. Indeed, it is apparent that Bell's mechanics and the District's mechanics were in fact misled and partly for this reason the engine was not placed into compliance with the mandatory FAA directive.

Much of the proof at trial concerned whether this noncompliance caused the engine failure that resulted in the crash or whether other, unrelated factors were responsible. Certain features of the engine need to be understood before this inquiry can be pursued. Each connecting rod has two steel bolts which bind the rod to the crankshaft. The bolts are subject to both lateral and longitudinal stress during operation of the engine. They are specially and carefully designed and manufactured for the specific purpose according to blueprints approved by the FAA, and have a specified hardness and an exacting diameter for close fit to the coupling holes. In order to assure a continuously tight clamp they are stretched at installation by a torque wrench to a specified added length exactly determined by micrometer measurement to $\frac{1}{10,000}$ of an inch. When one of these rod bolts is stretched at installation or at some later stage beyond its stretch tolerance it is permanently lengthened and will not return to its original length when the stress is removed. The bolt is consequently weakened and a fretting or galling effect may appear. The precise clamping tension desired is lost and the bolt will either fail immediately or the fretting and galling of the bolt so initiated will by a more gradual process of wear result in a later bolt failure through fatigue.

A teardown of the engine after crash disclosed the bolt that failed had had a pre-existing fatigue fracture which extended about one-third through the bolt. This was located at an area of fretting where the surface of the bolt hole in the cap made contact with the bolt's diameter. While it was not possible to measure the bolts in the sixth cylinder because they disintegrated when the rod broke, the proof showed that when the engine was examined after the crash most of the bolts in the other cylinders of the engine were slightly longer than

their original length after torque was removed when measured with a micrometer calibrated to $\frac{1}{10,000}$ of an inch. This strongly suggested excessive stress at some stage.

Much proof was presented as to the probable cause of the fracture. Several hypotheses were advanced, to wit:

(a) Saguaro over-torqued the bolt at installation.

(b) The police pilots oversped the engine beyond its maximum safety of 3500 RPMs.

(c) The police pilots and mechanics repetitively caused unnecessary stress by operation in the questionable range between 3200 RPM, the approved operation for take-off and cruising, and 3500 RPM.

■ The first contention was readily settled. The effort to establish that Saguaro over-torqued the bolt at time of installation totally failed. Not only did the mechanic who did the work testify to the contrary, but his work was double checked at the time by another member of the overhaul crew. Beyond this, however, the testimony of mechanical engineers and metallurgists established that if over-torquing had occurred at time of major overhaul in May, a bolt failure would have resulted long prior to the crash. Saguaro properly installed the bolts which Avco sent it for the overhaul.

Another frequent cause of such overstretch is overspeeding, that is, engine overspeeding beyond 3500 RPM, or running repeatedly within the 3200– to 3500–RPM range. At least since 1966 Avco has repeatedly advised that

> . . . connecting rod failures are the result of failure of the retaining bolts or galling of the connecting rod bearing bores. During overspeed operation, high stress concentration in areas where galling occurs produces fatigue cracks which lead to complete separation of the material. Excessively high overspeed, above 3500 RPM, coupled with repeated momen-

tary overspeed above 3200 (rated speed), can cause connecting rod galling and failure.

Overspeed can occur in various ways, including inadvertently during a gust of wind, during a fast descent, by mechanics working the motor on the ground, or by carelessness and inattention during operation. During flight, overspeed can usually be detected by a pilot because of an engine noise change which causes him to glance at the tachometer. Pilots are constantly alert to sense this difficulty which may occur at any stage of operation, particularly during autorotation. The District's police pilots were thoroughly trained and fully aware of the overspeed hazard. Any overspeed above 3200 RPM had to be reported in the log. If an overspeed occurred, the police pilots were fined if they failed to report it in the log, but no penalty was imposed if an overspeed was noted on the log. There was no overspeed reported on the engine in question by any of the several pilots who flew the helicopter and all pilots denied any overspeed. Moreover, when the engine was examined after the crash there was no indication of overspeed, but only an overspeed beyond 3500 RPM would have been apparent from the various parts examined. It could not be determined from physical inspection of the engine whether overspeeding had or had not occurred in the 3200– to 3500–RPM range. Some overspeeding in this range is not unusual and is expected to occur to some degree during normal operations. It may or may not overstretch the rod bolts, depending on its frequency and degree.

■ Given the uncertainty of the physical proof and the credible pilot testimony, overspeed was not established by a preponderance of the evidence. The fact the bolts appeared to be overstretched is not conclusive. The bolts may not have been measured to the precise standard required when originally supplied, thus creating a misleading impression, or some other factor beyond the Dis-

trict's control, such as an engine surge at time of failure, may have been responsible for the indication of overstretch. In any event at the very best the evidence is in equipoise.

The fact the cause of overstretching, if any, could not be determined does not, of course, end the matter. It is necessary to consider whether the accident would not have occurred if shot-peened bolts and chrome-backed bearings had been installed in Juneau III's sixth cylinder, that is, whether the failure to comply with the service bulletins and the subsequent FAA directive was a proximate cause of the engine failure and resulting crash.

The engine originally had chrome-backed bearings. Because the service bulletins were confusing, Saguaro communicated with Avco to determine whether plain or chrome-backed bearings should be used at time of overhaul. Bearings are not part of the rod assembly and a pertinent service bulletin, #1184A, did not indicate which type of bearing to use. Saguaro was incorrectly advised by Avco it could use plain bearings and used plain bearings it had in stock. In the certified parts list which accompanied the engine after overhaul it gave notice it had installed bearings that were not chrome backed.

It is a known phenomenon that galling of bearings can lead to a buildup which will cause the rod to fail at several different possible points, including the bolts. The bearings in the sixth cylinder were chewed up as a result of the failure and could not be analyzed. There is no proof that they caused the rod-bolt failure. Bearings in the other cylinders were generally in good condition, only a few showing very minor indications of incipient galling.

Turning to the effect of shot-peening on the life of a bolt subject to stress, the proof was more concrete. Commencing in the late 1960's it was recognized by Avco and others that tear and subsequent wear could occur on the connecting rod bolts as they loosened due to stress or other factors and cause bolt fatigue and failure at a point of fretting or galling. Indeed, a number of helicopter engines had failed due to bolt fatigue. Avco, in its constant commendable effort to improve engine reliability and life, developed a shot-peened bolt which had distinct advantages. This bolt, by a slight dimpling effect, retains lubrication and lessens wear as a bolt gradually fatigues following fretting or galling. Avco's chief engineer indicated that shot-peening would extend bolt life once fatigue set in by up to 20 hours. In all other respects the shot-peened bolt has the same strength, hardness and operational characteristics as a nonshot-peened bolt. Thus it is apparent that if Juneau III's engine had had shot-peened connecting rod bolts the helicopter would not have crashed when it did.

## II. CONCLUSIONS OF LAW

██ Those who build aircraft and component parts to be used for general aviation purposes must be held to high standards. It is essential that these concerns as well as aircraft operators be ever conscious that a plane is an inherently dangerous and sensitive instrumentality which can cause great harm if high standards of care are relaxed. The complex and exacting scheme of regulation developed by the FAA to this end must be reinforced and strengthened by courts called on to develop rules of liability and damages in situations like the instant case where it is apparent that high standards consistent with the regulatory scheme have not been maintained with resulting injury to persons and property. Given this premise and in light of the facts detailed above, legal conclusions as to liability must now be set forth.

██ It will be recalled that the bolt which broke and caused the accident showed a fatigue crack one-third through its diameter and that shot-peening would prolong the life of the bolt up to 20 hours after fatigue had

occurred. There was no proof indicating the length of time shot-peening would serve to delay the beginning of a crack caused by fretting or galling. It is apparent that if the required #77450 assembly had been installed, shot-peened bolts would have been installed and the engine failure would not have occurred when it did or earlier. Avco's engineering department revised its controlling drawing for this rod assembly to show use of shot-peened designed bolts in the connecting rod assembly as early as February, 1972, at which time this engineering improvement was approved by the FAA. A proximate cause of the engine failure was Avco's negligent failure to differentiate between a #77450 assembly without shot-peened bolts, which it caused to be installed at the last major overhaul of Juneau III's engine, and a #77450 assembly with shot-peened bolts, as required by the FAA directive and related service bulletins. Saguaro bears no responsibility, for it used parts approved by Avco and the overhaul was properly performed in all respects.

■ In spite of Avco's negligence in this regard, however, the District's claim against defendant for negligence must fail because of its contributory negligence, which arose out of inattention but not by reason of any malicious or criminal conduct. An engine log entry of December 23, 1972, at a time when the District was both owner and operator and after 303D had issued, states:

> Top OH (overhaul) this date at 596.4. Replaced all exhaust valves and number six cylinder guide, rings, gaskets, and seals as required. Total time since major overhaul 596.4. Engine installed by (unintelligible).

In other words, the engine was removed by the District, taken apart and full opportunity existed for its mechanics to determine with ease whether or not the engine was in compliance with 303D. This was not done.

■■ Moreover, as the testimony at trial indicated, the District, as a matter of law, had the primary responsibility as owner-operator to comply with the FAA's mandatory directive when it issued in February. *See also* 14 C.F.R. § 39.3 (1975). An adequate examination of Saguaro's parts list would have shown that the engine was not in compliance as to the bearings. It is a fair inference that if the bearings had been changed the absence of shot-peened bolts in the rods would have been noted and corrected. Thus, had the parts list been adequately checked by the District at the time the FAA mandatory directive issued, the accident would not have occurred, and a clear duty rested on the District to see that the directive was followed.

■ Fisher's claim against Avco is not barred by the negligence of the District. The law in this Circuit is well settled "by innumerable authorities that if, injury be caused by the concurring negligence of the defendant and a third person, the defendant is liable to the same extent as though it had been caused by his negligence alone. 'It is no defense for a wrongdoer that a third party shared the guilt of the same wrongful act, nor can he escape liability for the damages he has caused on the ground that the wrongful act of a third party contributed to the injury.' *Choctaw, O. & G. R. Co. v. Holloway*, [8 Cir.] 114 F. 458, [461–] 462 [*aff'd*, 191 U.S. 334, 24 S.Ct. 102, 48 L.Ed. 207 (1903)]." *Miller v. Union Pacific R. Co.*, 290 U.S. 227, 236, 54 S.Ct. 172, 174, 78 L.Ed. 285 (1933). *See Hicks v. United States*, 167 U.S.App.D.C. 169, 511 F.2d 407, 420–21 1975; *Danzansky v. Zimbolist*, 70 App. D.C. 234, 105 F.2d 457, 459 (1939); *Campbell v. District of Columbia*, 64 App.D.C. 375, 78 F.2d 725, 726–27 (1935). There is absolutely nothing in this record to suggest that the action or inaction of the District was malicious or criminal. *See* W. Prosser, Law of Torts § 44, at 287 (4th ed. 1971). Since a helicopter is a dangerous instrumen-

tality, *e. g., Middlleton v. United Aircraft Corp.*, 204 F.Supp. 856 (S.D.N.Y. 1960), the observations of the Second Circuit in a closely analogous case are particularly pertinent here:

Plaintiff's expert witness testified that the crack in the skid iron, at the place where it sheared off or broke at the time of the accident, was a progressive crack and must have had its inception a considerable time before the final and complete severance. He also testified that the crack should have been visible to the naked eye from the side, though not across the surface of the metal on the inside of the right-angled bend. There was evidence that McGrath subjected all its equipment to monthly inspection, but the crack was not observed, or reported.

It is elementary that the concurrent negligence of some third person will not absolve a defendant upon whom liability is sought to be imposed for the consequences of his own delict. Could the jury here, on the evidence before it, have properly found that the flow of causation, arising from the negligent fabrication of the skid iron by Farrington, was broken by McGrath's failure to discover the defect?

The point is not new, and many New York cases, decided after *MacPherson v. Buick,* have held that the negligent manufacturer of an article which is dangerous to life and limb when put to the use for which it was intended, may be liable, even though the negligence would have been without harmful effect had an intervening purchaser diligenty performed his duty to inspect. [Citations omitted.] *Fredericks v. American Export Lines, Inc.*, 227 F.2d 450, 453 (2nd Cir. 1955), *cert. denied*, 350 U.S. 989 76 S.Ct. 475, 100 L.Ed. 855 (1956).

Thus, the conduct of the District is a concurrent rather than a superseding negligence and does not absolve Avco of liability to Fisher.

Thus, as far as the various claims based on negligence are concerned, the Court holds that Saguaro was not negligent, that Avco and the District were negligent, that the District is barred from recovery in negligence by reason of its contributory negligence, and that Fisher can recover against Avco as a joint tort-feasor.

 Plaintiffs also assert a claim sounding in strict liability or negligence *per se*. They base this claim on Bell's and Avco's alleged violation of FAA regulations and the failure to provide the safer and more durable shot-peened bolts for use in Juneau III. The Court finds this contention to be without merit. FAA directive 73–5–1 was issued after the helicopter had been overhauled. Although Avco's failure subsequently to renumber its parts was negligent, no action by it or by Bell constituted a violation of any FAA regulation of which the Court was made aware. Moreover, the use of nonshot-peened bolts did not create a "defective condition." *See* Restatement (Second) of Torts § 402A (1965); Restatement (Second) of Torts § 402A (Tent.Draft 10, 1964). *See also Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893 (Pa. 1975). Although shot-peening was an advancement in the industry, it did not automatically and immediately render all nonshot-peened bolts defective. Indeed, the FAA directive itself allowed a grace period of 50 hours in replacing nonshot-peened bolts rather than immediately grounding all affected helicopters, a position inconsistent with the view that such bolts were defective. Since there is no evidence whatsoever that the bolts used in Juneau III were improperly manufactured or were otherwise unsatisfactory in comparison with other non-shot-peened bolts, this claim by plaintiffs is denied.

The District and Fisher also claim damages based on breach of warranty. Plaintiffs rely on *Berkebile v. Brantly Helicopter Corp., supra; Boeing Airplane Co. v. O'Malley*, 329 F.2d 585 (8th

Cir. 1964) ; *Cottom v. McGuire Funeral Services, Inc.,* 262 A.2d 807 (D.C.App. 1970), *subsequent appeal,* 284 A.2d 50 (D.C.App.1971) ; and *Picker X-Ray Corp. v. General Motors Corp.,* 185 A.2d 919 (D.C.Mun.App.1962). *See also Middleton v. United Aircraft Corp., supra.*

 While a formal express warranty was given by Bell covering the total helicopter, including the engine, it is not in evidence and not relied on for this claim. Rather, plaintiffs assert an implied warranty, contending that at the time of purchase Bell held out that the engine would not fail before at least 1,000 hours since the last major overhaul when the next major overhaul was due. It is clear that Bell recommended at the least 1,000 hours between major overhauls by indicating the engine time of service. However, where there exists an express warranty, and where the engine operated properly for a substantial period of time, a recommended service schedule is not necessarily to be equated with a warranty. In the present state of the record, it is impossible for the Court to determine the relationship between the express warranty and the asserted implied warranty. *See* D.C.Code §§ 28:2–314(1), 315, 316 (1973 ed.). The plaintiffs bore the burden of proof and, given the inadequacies of the evidence, the Court is unwilling to imply a warranty that the engine would last at least 1,000 hours. The breach of warranty claims of the District and Fisher are denied.

 The District also claims damages for breach of contract. This has more substance. The maintenance plan adopted by Bell and the District in July, 1971, in accordance with the lease-purchase agreement, provided that Avco service bulletins would be mandatory and treated as directives to Bell prior to sale. At the time of the sale the plane had logged 552.6 hours. It was therefore being operated during a 50-hour "grace period" given by the service bulletin during which "at owner's discretion" the adjustments to satisfy 303C had to be made by installation of shot-peened bolts in proper #77450 rod assemblies. In effect, the mandatory requirements of the bulletin were in effect and a leeway margin of less than 50 hours was available to do the necessary work. That the 50 hours would soon expire is shown by the fact that on November 3 and 4 when the sale was in actual progress the helicopter, to Bell's knowledge, logged an additional 26.4 hours. The remaining margin could easily have been consumed in a week or less. In short, the purchase occurred at a peril point. This alone placed a contractual duty on Bell at a minimum correctly to advise the District as to the engine's true condition. It failed to do this. Indeed, upon inquiry by the District, it, in effect, incorrectly advised that compliance with 303C had already been accomplished by assuring the District immediately prior to purchase that no major work on the engine was necessary. Bell played it too close to the line in allowing the plane to creep up to the maximum period of service without effectuating compliance or noting the immediate need for maintenance work. It was implicit in the purchase agreement that this condition did not exist. The District's later negligence does not defeat this contract claim. *See* 5A. Corbin, Contracts § 1040 (1964).

This breach of contract makes paragraph L of the lease-purchase agreement, which reads in pertinent part as follows, applicable:

L. Responsibility for Damages: The Contractor shall be liable for all damages to property of the District of Columbia caused by (i) the contractor's providing of defective rented property, (ii) the contractor's defective maintenance of rented property (when such maintenance is required by this contract), or (iii) the negligent operation of the rented property by the contractor or its employees and shall hold the District of Columbia harmless for all claims for dam-

ages caused to third persons or property of third persons arising out of (i) the contractor's providing of defective rented property, (ii) the contractor's defective maintenance of rented property (when such maintenance is required by this contract), or (iii) the negligent operation of the rented property by the contractor or its employees, and all other times except when operated by or at direction of District of Columbia employees.

Thus the District may recover for breach of contract from Bell.

It remains in this litigation to determine the amount of damages now that the liability issues have been resolved. The parties should confer and appear at a status conference at 4:00 p. m. on Tuesday, November 18, 1975, to report on efforts to settle damages and, failing settlement, to schedule further trial proceedings. An Order dismissing Saguaro is attached.

## ORDER

The Court having determined, for reasons set forth fully in an accompanying Memorandum Re Liability, that defendant Saguaro Aviation Corporation is not liable for any reason to either the plaintiff or the intervenor-plaintiff, now therefore it is

Ordered that the complaint as to Saguaro Aviation Corporation shall be and hereby is dismissed, and its cross-claim is moot.