[Civ. No. 484.   Fifth Dist.   July 11, 1966.]

VIOLET DIAMOND, as Administratrix, etc., Plaintiff and Appellant, v. BETTY GROW, as Administratrix, etc., Defendant and Respondent.

[Civ. No. 596.   Fifth Dist.   July 11, 1966.]

BETTY GROW, as Administratrix, etc., Plaintiff and Respondent, v. VIOLET DIAMOND, as Administratrix, etc., Defendant and Appellant.

(Consolidated appeals.)

Simon Marootian and Paul S. Mosesian for Appellant.

Bronson, Bronson & McKinnon and Gary R. Ricks for Respondent.

STONE, J.—An airplane piloted by Martin Diamond and another piloted by California Highway Patrol Officer Gary Lee Grow collided in midair; both pilots were killed instantly. The widow of each pilot, as administratrix of his estate, filed a

wrongful death action. The two cases were consolidated for trial; the issue of liability was tried first, resulting in jury verdicts in favor of the Estate of Grow in both cases. In Diamond v. Grow, plaintiff Diamond filed notice of appeal. Subsequently, in Grow v. Diamond, the issue of damages was tried before another judge and a different jury. Diamond then appealed in that action also, but raised no issue as to the damage phase of the trial. As the sole issue presented by both appeals is liability, counsel stipulated that the two appeals might be consolidated for hearing.

The consolidation for trial caused some confusion because in the action Grow v. Diamond the Estate of Diamond was defended as to liability by one firm of attorneys, while in the Diamond wrongful death action a different attorney represented Mrs. Diamond, administratrix of the estate. The attorney for Mrs. Diamond filed the notice of appeal in each case, although he did not act as defense attorney during trial of the liability phase of Grow v. Diamond.

Matters became more confused when the attorneys who had represented the Estate of Diamond as to liability in Grow v. Diamond, paid the judgment in full even though notice of appeal had been filed therein by the attorney representing the administratrix of the Estate of Diamond.

Respondent Grow moved to dismiss upon the ground that satisfaction of the Grow judgment for damages made both appeals moot. However, before argument, the motion was dismissed. There is nothing in the record before us indicating that the administratrix of the Estate of Diamond consented to payment of the judgment, or that the attorney who appealed on behalf of Estate of Diamond in both actions was consulted or even notified of the payment. Further, the payment was not by way of compromise as the judgment was paid in full. Therefore the satisfaction of judgment does not affect either appeal on the issue of liability.

Commenting upon a similar circumstance on appeal, the Supreme Court said, in *Reitano* v. *Yankwich,* 38 Cal.2d 1, at pages 4-5 [237 P.2d 6] : "In the instant case there is no indication that the payment of the judgment for costs was by way of compromise or pursuant to an agreement not to prosecute an appeal. The main portion of the judgment—the merits of the case—that plaintiff take nothing, is the part under attack on appeal." (See also *Estate of Merrill,* 29 Cal.2d 520, 524 [175 P.2d 819] ; 3 Cal.Jur.2d, Appeal and Error, § 133, pp. 593-596.) Furthermore, none of the parties to either appeal has formally raised the issue of satisfaction of judgment.

We now turn to the merits. On January 18, 1962, Gary Lee Grow, acting within the scope of his employment as a California Highway Patrol Officer, was piloting a Cessna "spotter plane" along Highway 99, on a flight that originated at the Visalia airport. Upon reaching the north edge of the City of Madera, Grow communicated with a fellow highway patrol officer on the ground, advising him that he would land at the Madera airport in approximately two minutes. Grow then proceeded northward and when opposite the Madera airport, entered upon a normal left turn which he accentuated by a steep bank an instant before impact.

Martin Diamond, piloting a rented Piper Tri-Pacer airplane southward from Merced, was using Highway 99 as a navigational aid due to limited visibility. Approaching from the north on a collision course with the highway patrol plane, Diamond made a sharp right turn immediately before the collision. Thus Grow's plane was in the course of a left turn and Diamond's a right turn as the two collided and crashed, killing both pilots. The planes were flying at approximately 1,000 feet at the time of impact; visibility was restricted by haze to approximately one mile.

Evidence surrounding the crash was sketchy, as both planes were almost completely demolished and the single eyewitness was on the ground some distance away. Necessarily, the expert witnesses relied to a great extent upon custom and hypothesis. Although the only error we find is one of law in the instructions, the scanty record does have a bearing upon the effect of the error.

Among the instructions the court read were a number of Civil Air Regulations governing the operation of aircraft, concluding with the instruction that: "If either pilot involved in these lawsuits volated any of the regulations of the Federal Aviation Administration which I just read to you, a presumption arises that he was negligent."

No one questions the propriety of this instruction insofar as it relates to Civil Air Regulations; the trouble arises because one of the instructions in the series was not a Civil Air Regulation, but an instruction quoting Good Operating Practice 16,[1] taken from Flight Information Manual (Vol. 13, Dec. 1959; Consol. Reprint Oct. 1961) published by the Federal

---

[1]Respondents offered and the court gave this instruction as Practice 15 from Volume 14, October 1962, published after the accident occurred. Herein we follow the numbering of the Consolidated Reprint of Volume 13, which was in effect at the time of the accident. The language quoted is identical in both publications.

Aviation Agency. It reads: "At most airports and military air bases traffic pattern altitudes for propeller driven aircraft generally extend from 600 feet to as high as 1500 feet above the ground. Also traffic pattern altitudes for military turbojet aircraft sometimes extend up to 2000 feet above the ground. Therefore, pilots of enroute aircraft should be constantly on the alert for other aircraft in traffic patterns and avoid these areas whenever possible."

■ The general rule is: "The violation of a statute or ordinance, or of a safety order not incorporated in a statute or ordinance but issued by a public body, . . . constitutes negligence as a matter of law, or 'per se,' as it is frequently described." (35 Cal.Jur.2d, Negligence, § 16, pp. 502-503.)

So the question narrows to whether Good Operating Practice 16 is a regulation in the sense of a safety order issued by a public entity, the violation of which gave rise to a presumption of negligence as a matter of law. Respondents have cited no authority, and independent research has turned up none, reflecting that "Good Operating Practices" are accorded the dignity of a statute, an ordinance, or a safety order. ■ In determining if a rule or order establishes a standard of care the violation of which constitutes negligence per se, the critical test is whether compliance therewith is mandatory. Or, to state it somewhat differently, the test is whether the standard of care is merely suggested by the order, or defined by it.

■ With this test in mind, we turn to Good Operating Practices applicable at the time of the accident. The prefatory language clearly reflects an intent to advise rather than order; it emphasizes the impracticability of establishing Good Operating Practices as a set of rules. The introduction reads: "A comprehensive analysis of air traffic incidents reveals that traffic conflictions occur quite frequently when no one has violated any specific air traffic rule. Such conflictions might be reduced by writing more rules, but there is serious doubt as to the practicability of writing more rules when many of our air traffic problems are due to difficulty in applying existing rules. Furthermore, it is extremely unlikely that air traffic rules can ever be written so as to eliminate the need for good judgment in the planning and conduct of every flight.

"Conformance with the following Good Operating Practices will greatly reduce traffic conflictions: . . . "

The various Good Operating Practices are in the same tenor; compliance is not commanded—they admonish, rather than order. Indeed, the generality, even vagueness, of the language precludes the implication of an order. For example,

recommended practice numbered 1 commences: *"Use reasonable restrain [sic] in exercising the prerogative of VFR flight, especially in terminal areas."*

Practice No. 2 reads: *"Be alert at all times, especially when the weather is good.*

"Most pilots pay attention to business when they are operating in full IFR weather conditions, but strangely, air collisions almost invariably have occurred under ideal weather conditions. Unlimited visibility appears to encourage a sense of security which is not at all justified."

Practice No. 5 is a good example of the advisory nature of Good Operating Practices, since it suggests that a pilot yield a right of way that may be his as a matter of law: *"If you think another aircraft is getting too close to you, give way instead of waiting for the other pilot to respect the right-of-way to which you may be entitled.*

"It is a lot safer to pursue the right-of-way angle after you have completed your flight."

Practice No. 14 reads, in part: "Every pilot (either VFR or IFR) is *urged* to visit the nearest FAA Flight Service Station prior to departure for a preflight briefing and to file a flight plan." (Italics added.)

Practice No. 18 reads: "It is strongly *recommended* that a VFR flight plan be filed for every VFR flight. . . ." (Italics added.)

We conclude that Good Operating Practices are advisory, and a violation thereof does not give rise to a presumption of negligence.

Respondents argue that no error was committed since expert testimony corroborated the substance of the instruction. Such testimony, however, is merely evidence of custom; although relevant to the question of whether due care was exercised in the light of the circumstances, it does not establish a standard of care. ■■■ The place of custom in a negligence case is discussed in *Bouse* v. *Madonna Constr. Co.*, 201 Cal.App.2d 26 [19 Cal.Rptr. 823]. The following at pages 29-30 is pertinent: ". . . the custom of others in a business or industry does not, as a matter of substantive law, establish a legal standard of care [citations], and evidence of custom is received to aid the jury in determining therefrom, and from all of the other evidence in the case, whether the conduct in question measures up to the legal standard. [Citations.] But 'the standard is not fixed by custom. The standard is always due care. The presence or absence of custom does not alter that standard. Custom may assist in the determination of what constitutes due care.

What others do is some evidence of what should be done, but custom is never a substitute for due care.' [Citations.]''

In the light of the entire record, the error was prejudicial. As noted at the outset, there is a paucity of direct evidence surrounding the happening of the accident. Absent a presumption of negligence, there is little to favor either pilot; that is to say, the case is a close one because no one knows exactly what happened in either cockpit just prior to the collision. Under this state of the evidence, the court instructed the jury: ''To prove that a violation of a statute or regulation such as that charged in these cases was excusable or justifiable so as *to overcome the presumption of negligence*, the evidence must support a finding that the person who violated the regulation did what might reasonably be expected of a person of ordinary prudence who desired to comply with the law, acting under similar circumstances.'' (Italics added.)

We conclude that it was reversible error to instruct the jury that a presumption of negligence arose from violation of Good Operating Practice No. 16, thereby placing upon appellant the burden of overcoming that presumption.

The judgments are reversed.

Conley, P. J., concurred.