Justin **RUDELSON**, a minor, et al., Plaintiffs,

v.

**UNITED STATES of America,**
Defendant.

Frances **AARDEMA** et al., Plaintiffs,

v.

**UNITED STATES of America,**
Defendant.

**NATIONAL INDEMNITY COMPANY** by Omni Aviation Managers, Inc., Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

No. 73–566–HP, 73–642–HP and 76–1008–HP.

United States District Court, C. D. California.

March 22, 1977.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

PREGERSON, District Judge.

The above captioned cases, filed in the Central District of California, were consolidated for a court trial on the issue of liability. The trial took place on December 8, 9, and 10, 1976. As part of the proceedings, at the request of counsel, the Court visited the Santa Monica Airport Control Tower and while there, viewed the airfield, the flight traffic pattern, and the flight traffic area from the local air traffic controller's station.

Having heard the testimony of the witnesses, having studied the documentary evidence, having perused the opening and closing post-trial briefs of counsel, having given the matter due consideration the Court, being fully advised in the premises, makes its findings of fact as follows:

## FINDINGS OF FACT

It is true that:

1. These are consolidated actions for wrongful death and for property damage arising out of a mid-air collision between two airplanes, a Cessna 150, registration No. N60003, (Cessna 003) and a Piper Colt, registration No. N4928Z, (Piper).

Ian Herzog, The Law Offices of Ned Good, Los Angeles, Cal., for plaintiffs-Rudelson.

Stephen A. Acker, Pasadena, Cal., for plaintiffs-Aardema.

Joyce R. Lanza, Law Offices of Arthur Wasserman, Los Angeles, Cal., for plaintiff-National Indemnity Co.

Marshall Filler, Dept. of Justice, Civil Div., Washington, D. C., Donald A. Fareed, Spec. Asst. U. S. Atty., William D. Keller, U. S. Atty., Frederick M. Brosio, Jr., Asst. U. S. Atty., Los Angeles, Cal., for defendant.

2. The collision occurred in the sky over Santa Monica, California, on the morning of September 9, 1971, about 9:07:00, about a mile south of the Santa Monica Control Tower (Tower), and about 1,000 feet above the airfield, on the downwind leg of the traffic pattern for Runway 21 of the Santa Monica Airport.

3. Runway 21, which is about 5,000 feet long, lies in a general northeast-southwest direction. The Tower is located about 1,000 feet southwest of the northernmost corner of the runway. Aircraft landing on or tak-

ing off from Runway 21 fly a left hand traffic pattern as follows: (a) an aircraft taking off flies in a southwest direction along the upwind leg and turns about 90° to its left on the crosswind leg and then departs the area from the crosswind leg which intersects the downwind leg at about 90°; (b) an aircraft landing enters the traffic pattern at about 45° to the downwind leg, establishes itself in the downwind leg, turns about 90° to its left on the base leg and then turns about 90° to its left on the final approach to the runway. See Appendix A.

4. The Tower was staffed by Federal Aviation Administration (FAA) personnel. Through its FAA personnel, the United States Government undertook the responsibility of operating an air traffic control system, involving the safety of aircraft and occupants of aircraft, at the Santa Monica Airport.

5. During the morning of the collision the weather was clear, visibility was 12 miles, wind was from 200° at 6 knots, and traffic over the Santa Monica Airport was light to moderate.

6. At the time of the collision, weather conditions permitted aircraft to operate under Visual Flight Rules (VFR) and both aircraft were flying under VFR rules. These VFR rules require pilots to operate aircraft under conditions of "see and be seen" or "see and avoid"—i. e., aircraft avoid collisions by seeing and avoiding one another.

7. Jerrold Rudelson, occupying the left seat, and Thomas Duval, occupying the right seat of the Cessna 003, were killed as a result of the collision and ensuing crash of the aircraft.

8. Prior to the collision, Duval, a licensed flight instructor, was giving flying lessons to Rudelson, a licensed student pilot. The Cessna 003, equipped with dual controls, was being operated as a student-pilot trainer.

9. Prior to the collision, Duval held a commercial pilot's certificate with ratings for single-engine land and flight instructor, and had accumulated 960.5 flying hours. Rudelson held a student pilot's certificate and had accumulated 21.4 flying hours, of which 3.0 hours were for supervised solo flights.

10. The pilot and sole occupant of the Piper, Marvin Aardema, was killed as a result of the collision and ensuing crash of his aircraft. At the time of the collision, Aardema held a private pilot's certificate, airplane single-engine land, and had accumulated 440.1 total flying hours.

11. On the date of the collision, National Indemnity Company was the insurer of Aviation Unlimited, Inc., the operator of Cessna 003, and Melvin Miller, the owner of the aircraft. On that date Duval was employed as a flight instructor by Aviation Unlimited, Inc., and by reason of such employment became an insured under National Indemnity's insurance policy. As a result of the mid-air collision, National Indemnity paid money to the Rudelson heirs and other persons or business entities for property damage. By reason of such payments, National Indemnity is subrogated to the rights of its insured against third parties.

12. At 8:52:05, prior to the collision on the morning of September 9, 1971, Cessna 003 radioed the Tower and requested permission for student pilot Rudelson to "work the pattern," i. e., fly the entire pattern, in order to practice touch and go landings with his instructor Duval.

13. At 8:58:35, Cessna 003 was cleared for take-off by Jon Middleton, the local FAA controller on duty in the Tower.

14. At 9:01:55, Cessna 003 was cleared to make a touch and go landing by Middle-

ton after the aircraft advised that it was on the downwind leg for Runway 21, abeam the Tower.

15. At about 9:04:00, Cessna 003 executed a touch and go landing on Runway 21 and climbed out on the upwind leg of the traffic pattern.

16. At 9:04:40, while Cessna 003 was climbing out on the upwind leg, Middleton instructed the aircraft to angle left 10° for noise abatement purposes.

17. At 9:04:55, observing that Cessna 003 was not complying with his previous request, Middleton again instructed it to angle left 10° and further advised it that another aircraft, Cessna 32Q, was climbing out behind Cessna 003.

18. Middleton then observed Cessna 003 angle left 10°; it was never seen by him again.

19. After climbing out on the upwind leg, Cessna 003, which had been cleared to practice touch and go landings, turned left about 90° onto the crosswind leg, and later turned left about 90° onto the downwind leg.

20. After Cessna 003 was established on the downwind leg for about 6 to 8 seconds, the fatal mid-air collision with the Piper occurred.

21. Prior to the mid-air collision, the Piper had departed from Compton Airport, Compton, California enroute in a generally northerly direction to Santa Monica Airport.

22. Although equipped with a two-way radio, the Piper entered the Santa Monica Airport traffic area and the Santa Monica Airport traffic pattern without establishing two-way radio communications with the Tower, as required by 14 C.F.R. § 91.87. It is reasonable to assume that the Piper suffered an in-flight radio failure which pre-

vented it from communicating with the Tower prior to entering the traffic pattern.

23. Even though the Piper's radio was inoperative, it could have communicated with the Tower by dipping its wings and then receiving directional light signals beamed from the Tower's light gun pursuant to Federal Air Regulations 14 C.F.R. §§ 91.77 and 91.87.

24. Despite the fact that it failed to establish radio communication, the Piper proceeded in a general northerly direction towards the Tower. As it approached the airfield, the Piper first flew over Marina del Rey, which is about 3 to 4 miles from the Tower. The Piper then entered the traffic pattern on about a 45° angle at a point somewhere along the first third of the downwind leg. After the Piper established itself on the downwind leg for 6 to 8 seconds, the Piper and the Cessna 003 collided at a point somewhere between one-third and one-half way. up the downwind leg.

25. When both aircraft became established in the downwind leg, a distance of at least 6 to 7 aircraft lengths separated them.

26. Prior to the collision the Cessna 003 was climbing from beneath and to the rear of the Piper. Upward vision of the occupants of the Cessna was blocked because of the aircraft's high wing configuration. Blind spots can be compensated for by head movement and aircraft movement.

27. At the time of the collision both aircraft were on a course of 030° heading in the general direction of the sun.

28. Neither the Piper nor the Cessna 003 executed any evasive maneuvers prior to the moment of collision. They failed to see each other.

29. At 9:07:05, the Tower called Cessna 003 and asked it to look at a fire on the ground to its left. The controller unwit-

tingly was asking the ill-fated aircraft to examine its own burning ruins.

30. Northbound aircraft entering the traffic pattern for Runway 21 normally fly over the Marina toward the Tower and enter the downwind leg on a 45° angle through a corridor whose width runs from the intersection of the downwind/crosswind legs to mid-point on the downwind leg. The Piper entered the downwind leg through this corridor.

31. At 9:03:35—about a minute and a half after he last saw Cessna 003—Middleton went back on the air and cleared Cherokee 94U for take-off and instructed Cherokee 82N to taxi into take-off position and hold. The Cessna 003/Piper mid-air collision was now 25 seconds away. At this time it is fair to say that the Piper was just about 12 to 15 seconds from entering the downwind leg of the traffic pattern, unannounced.

32. Even though providing runway separation and aircraft sequencing are high priority duties, scanning the traffic pattern is nonetheless part of a local controller's job to be performed on "as-time-permits" basis. Controllers are trained to scan the traffic pattern. Scanning is generally necessary to carry out properly the controller's duty of sequencing. Controllers are trained to execute their responsibilities quickly and vigilantly and to perform more than one task at a time. Here two minutes elapsed between the local controller's last observation of Cessna 003 and the mid-air collision. During this two minute period, the controller apparently devoted his entire attention to Cherokee 94U and Cherokee 82N. Issuing take-off and sequencing instructions to these two aircraft hardly required two minutes of the controller's undivided attention. There was ample time during that interval to scan the traffic pattern several times—at least to check the positions of Cessna 003 and Cessna 32Q relative to each other and later relative to Cherokee 94U. From the local controller's position, viewed by the Court, a scan of the traffic pattern lying to the south of the Tower requires no more than a quarter turn of the head and can easily be done in 3 to 5 seconds. Had the controller scanned the traffic pattern, his trained eyes probably would have spotted the unannounced Piper in sufficient time to warn it with the light gun of impending danger and to alert the other aircraft in the pattern of the Piper's unannounced presence in the entry corridor—a place where it appears that aircraft collisions in the traffic pattern are most likely to occur. Such a warning, had it been radioed, would have been a substantial factor in avoiding the collision.

33. In addition to the local controller, four other FAA employees were on duty at the Tower as air traffic controllers at the time of the mid-air collision. They were Darrel Cuney (flight data controller and watch supervisor), Jonnie Marsh (ground controller), William Marple (supervisor) and Lawrence Morton (tower chief).

34. Not one of the five FAA employees on duty at the Tower ever saw the Piper, nor were they otherwise aware of its presence in the air at any time before, during, or after the collision which occurred at a place in the sky clearly visible from the Tower—a place where aircraft entering the traffic pattern are normally expected to be.

35. From the local controller's position in the Tower, the entire airport traffic pattern in use on the morning of the collision was clearly visible. This pattern was in front of the Tower, looking to the southeast, and extended in a general northeast/southwest direction. To clearly see the entire pattern from the local controller's position required no more than a quarter turn of the head.

36. It is reasonably foreseeable to a prudent traffic controller and to other prudent FAA Tower control personnel that aircraft will enter the airport traffic area unannounced in contravention of 14 C.F.R. § 91.-

87. In anticipation of this and other contingencies the Tower is equipped with a light signaling gun. Local controllers are taught that aircraft will from time to time arrive at an airport such as the Santa Monica Airport without establishing radio communication.

The following Conclusions of Law insofar as they may be considered Findings of Fact are so found by this Court to be true in all respects.

## CONCLUSIONS OF LAW

1. These actions are brought against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq.

2. The Court has jurisdiction under 28 U.S.C. § 1346(b).

■ 3. California tort law controls the disposition of this case. 28 U.S.C. § 1346(b), *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

■ 4. Under California tort law actionable negligence involves: "(a) a legal duty to use due care; (b) a breach of such legal duty; (c) the breach as a proximate or legal cause of the resulting injury." 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts § 488, p. 2749.

■ 5. The decision to operate air traffic control towers is a legislative one and negligent operation of the facilities subjects the United States to liability. *Yates v. United States*, 497 F.2d 878 (10th Cir. 1974).

6. "[T]he United States Government, having assumed the responsibility of operating an air traffic control system, involving the safety of aircraft, passengers, crews, and cargos, must meet its responsibility according to the standard of reasonable care; that this duty is not limited by any concept that the extent of its care in this respect rests within its own discretion; that neither is its duty in this respect limited by the letter of its own regulations, policies or manuals; that the government is liable under the Federal Tort Claims Act, 28 U.S.C. § 1346 for the negligent act or omission of its employees in the operation of its traffic control system under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law where the act or omission occurred. See *Eastern Airlines v. Union Trust Co.*, [4 Avi. 17,546], 221 F.2d 62, 73–79 (D.D.C.1955)." *Hennessy v. United States*, 12 Avi. 17,410 at 17,416 (N.D.Ca.1971).

■ 7. Proximate cause of an injury is defined as a cause which, in natural and continuous sequence produces the injury and without which the injury would not have occurred, *Blanton v. Curry*, 20 Cal.2d 793, 129 P.2d 1 (1942), and which is a substantial factor in causing the injury. *Jarchow v. Transamerica Title Insurance Co.*, 48 Cal.App.3d 917, 122 Cal.Rptr. 470 (1975). There may be more than one proximate cause of an injury. *Modica v. Crist*, 129 Cal.App.2d 144, 147, 276 P.2d 614 (1954); 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts § 624, p. 2906.

■ 8. A violation of Federal Aviation Regulations is negligence per se. *Gatenby v. Altoona Aviation Corp.*, 407 F.2d 443 (3rd Cir. 1969). This rule is consistent with California law that violation of a safety regulation is negligence per se. See *Haft v. Lone Palm Hotel*, 3 Cal.3d 756, 763–4, 91 Cal. Rptr. 745, 748–9, 478 P.2d 465, 467–9 (1970).

■ 9. The Government through FAA personnel on duty in the Tower at the time of the Cessna 003/Piper collision breached its legal duty to exercise reasonable care in operating an air traffic control system because:

(a) the local controller, having had sufficient time to do so, failed and neglected

to scan the traffic pattern, particularly the entry corridor to the downwind leg, from 9:04:55 to 9:07:00—a period of about 2 minutes. Had he done so and had he not unnecessarily diverted his entire attention to providing runway separation to Cherokee 94U and Cherokee 82N, he probably would have seen what was in plain view in a clear sky, namely, the unannounced Piper, in sufficient time (1) to warn the Cessna 003 by radio of the hazard presented by the unannounced aircraft and (2) to signal the Piper by light gun.

(b) the other FAA personnel on duty in the Tower also failed and neglected to see the unannounced Piper approach and then turn onto the downwind leg. Had they done so, even a few seconds before the collision, there would have been sufficient time to warn Cessna 003 of and divert it from the impending danger.

10. The above described negligent omissions of FAA personnel were a proximate cause of the collision between the Cessna 003 and the Piper.

11. In *Hamilton v. United States*, 497 F.2d 370 (9th Cir. 1974), a case involving a mid-air collision in the traffic pattern at Oakland Airport in Northern California, the Ninth Circuit in absolving the air traffic controller said: "Nor was the controller negligent in failing to inform each aircraft of the other's position." 497 F.2d at 376. Contrary to the government's assertion, this language does not enunciate an iron clad rule of law applicable to all aircraft flying VFR, but merely states a conclusion based on the evidence in that case. The evidence there showed that the controller, once the emergency developed, did not warn the pilots, but made a split second decision to try to avoid a collision by radioing flight instructions to them, instructions which he had reason to believe were being carried out. As a matter of fact, before the emergency actually developed the controller expressly informed one aircraft of the other's

reported position, and since both aircraft had operative radios, each pilot presumably heard all communications between the tower and other aircraft. Moreover, after concluding that the trial court was not clearly erroneous in finding that the controller's failure to warn did not constitute negligence, the Ninth Circuit explained: "This is not to say, however, that a controller must never warn. When a controller is aware of dangerous conditions, his failure either to warn or to give instructions, i. e., his failure to act at all, may constitute negligence." 497 F.2d at 376, n. 13. In another observation pertinent to this case the Ninth Circuit pointed out that: "An air traffic controller 'is not supposed to give his attention to any one aircraft in the control zone if other aircraft are present. All aircraft within the control zone should have the controller's attention.' *Franklin v. United States*, 7 Cir., 1965, 342 F.2d 581, 585." 497 F.2d at 376.

12. At the time *Hamilton* was decided contributory negligence of the pilots, as found by the court, precluded any recovery against the United States under California's substantive law as it then obtained. But, at the time the instant cases were called for trial, the California Supreme Court in *Li v. Yellow Cab Co.*, 13 Cal.3d 804, 119 Cal.Rptr. 858, 532 P.2d 1226 (1975) had abrogated contributory negligence as a complete defense and had substituted a judicially-created system of comparative negligence.

13. In *Li v. Yellow Cab*, the California Supreme Court held that: "[T]he 'all-or-nothing' rule of contributory negligence as it presently exists in this state should be and is herewith superseded by a system of 'pure' comparative negligence, the fundamental purpose of which shall be to assign responsibility and liability for damage in direct proportion to the amount of negligence of each of the parties. Therefore, in all actions for negligence resulting in injury to person or property, the contributory negligence of the person injured in person or

property shall not bar recovery, but the damages awarded shall be diminished in proportion to the amount of negligence attributable to the person recovering." 13 Cal.3d at 828–29, 119 Cal.Rptr. at 875, 532 P.2d at 1243.

14. *Li v. Yellow Cab*, decided in March, 1975, was expressly made retroactive and applicable to cases in which trial had not begun before the *Li* decision had become final. 13 Cal.3d at 829, 119 Cal. Rptr. 858, 532 P.2d 1226. Accordingly, California's system of comparative negligence applies to the disposition of the cases now before this Court.

15. Pilots of aircraft operating under VFR conditions have the responsibility and are required by Federal Aviation Regulations to "see and avoid" and to separate themselves from other traffic. 14 C.F.R. §§ 91.67(a), and 91.65(a). To "see and avoid" other aircraft, pilots should visually scan or "clear" the air space into which they are flying and should maneuver the aircraft to eliminate "blind spots."

16. Under Federal Aviation Regulations the pilot of an aircraft is directly responsible and is the final authority for its safe operation. 14 C.F.R. § 91.3.

17. Pilots are required to maintain two-way radio communications with air traffic control while operating in an airport traffic area. 14 C.F.R. § 91.87.

18. Federal Aviation Regulations prohibit the operation of "an aircraft so close to another aircraft as to create a collision hazard." 14 C.F.R. § 91.65(a).

19. Aardema, the pilot of the Piper, was negligent in the operation of his aircraft in that (a) he failed to exercise reasonable diligence and vigilance to "see and avoid" and separate the Piper from the Cessna 003, (b) his lack of vigilance caused him to fly the Piper so close to the Cessna 003 so as to create an unreasonable risk of a collision, in addition, (c) he entered the traffic pattern unannounced and without radio or visual contact with the Tower.

20. Aardema's negligence was a proximate cause of the collision.

21. Rudelson, the student pilot, and Duval, the flight instructor, were negligent in the operation of the Cessna 003, equipped with dual controls, in that (a) they failed to exercise reasonable diligence and vigilance to "see and avoid" and separate the Cessna 003 from the Piper and (b) their lack of vigilance caused the Cessna 003 to fly so close to the Piper as to create an unreasonable risk of a collision.

22. The negligence of Rudelson was a proximate cause of the collision.

23. The negligence of Duval was a proximate cause of the collision.

24. Under the doctrine of comparative negligence the trier of fact is required to assign a specific percentage factor to the degree of negligence attributable to a particular party. The Court concludes that the proportion of the amount of fault attributable to each party is as follows:

| Party | Percentage of Fault |
| --- | --- |
| United States Government | 20 |
| Marvin Aardema | 45 |
| Jerrold Rudelson | 10 |
| Thomas Duval | 25 |

Having resolved the liability issue and determined the percentage of fault attributable to each party the Court must then decide the damage claims of plaintiffs. Accordingly, this matter is set for further proceedings to determine the damage issue on April 19, 1977 at 08:30:00.

Appendix A to follow.

1110

# SANTA MONICA MUNICIPAL AIRPORT

**SANTA MONICA, CALIF.**
**AIRPORT LAYOUT**

FINAL

BASE

N
15° 10'

TOWER

OCEAN PARK BLVD

4987 x 150 CONC

ADM. BLDG.
LIGHTED SOCK &
SEG. CIRCLE
ON ROOF

0    1    2
SCALE IN 1000 FT.

VOR

UPWIND

DOWNWIND

CROSSWIND

DOWNWIND
ENTRY
1200' MSL

TO
MARINA DEL REY

DEPARTURE

Appendix A