[L.A. No. 31838. Dec. 17, 1984.]

DORIS ELSWORTH et al., Plaintiffs and Respondents, v.
BEECH AIRCRAFT CORPORATION, Defendant and Appellant.

JO ANN MIRO et al., Plaintiffs and Respondents, v.
BEECH AIRCRAFT CORPORATION, Defendant and Appellant.

COUNSEL

Morris, Polich & Purdy, Landon Morris, Robert S. Wolfe, Gerald P. Schneeweis, Walter J. Lipsman, Gibson, Dunn & Crutcher and Robert Forgnone for Defendant and Appellant.

Magana, Cathcart, McCarthy & Pierry, Daniel C. Cathcart, Deborah Mitzenmacher, James F. Boccardo, Edward J. Niland and Stanley A. Ibler, Jr., for Plaintiffs and Respondents.

OPINION

**MOSK, J.**—Section 669 of the Evidence Code sets forth the doctrine commonly called negligence per se. It provides that negligence of a person is

presumed if he violated a statute or regulation of a public entity, if the injury resulted from an occurrence that the regulation was designed to prevent, and if the person injured was within the class for whose protection the regulation was adopted. This presumption may be rebutted by proof that the violator did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law.[1]

The primary issue in this case is whether the doctrine may be applied to hold liable for defective design the manufacturer of an aircraft that allegedly violated safety standards promulgated by the Federal Aviation Agency (FAA), even though the agency had issued to the manufacturer a certificate declaring that the design of the airplane met all applicable safety standards.[2]

In 1974 Edward O. Miro, an experienced pilot, took three prospective buyers on a demonstration flight in a Travel Air twin engine airplane manufactured by defendant Beech Aircraft Corporation (Beech). It was daylight, the weather was clear, and the winds were light. After takeoff, the airplane reached an altitude of 800 feet, made two right turns into the traffic pattern, then suddenly turned left out of the traffic pattern, fell over, and went into a spin. It recovered briefly, but fell again into a final flat spin and crashed seven minutes after takeoff. All aboard were killed.

When the Travel Air was found after the crash, it was discovered that Miro had turned off the left fuel selector, shut down the left engine, and feathered (i.e., streamlined in the direction of flight) the left propeller blades. The landing gear was in the "down" position, and the wing flaps were partially or all the way down. A thermostatic valve in the left engine was broken.

The wives and children of the three passengers filed wrongful death actions against Beech and Miro, and Miro's heirs filed an action against

---

[1]Section 669 of the Evidence Code provides in relevant part:

"(a) The failure of a person to exercise due care is presumed if:

"(1) He violated a statute, ordinance, or regulation of a public entity;

"(2) The violation proximately caused death or injury to person or property;

"(3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and

"(4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted.

"(b) This presumption may be rebutted by proof that:

"(1) The person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law; . . .".

[2]The FAA is the successor agency of the Civil Aeronautics Board under the Federal Aviation Act of 1958. (49 U.S.C. § 1301 et seq.) For simplicity, all references herein to the agency will be to the FAA, even if the reference deals with conduct prior to 1958.

Beech.[3] Miro's insurer settled with the heirs of the passengers, and the trial proceeded against Beech. The heirs of the passengers and of Miro (hereafter plaintiffs) sought recovery on several theories, including negligence per se, alleging that the Travel Air did not comply with various safety regulations adopted by the FAA.[4]

At the trial, plaintiffs claimed that the crash was caused by the stall of the airplane with the left engine feathered, and an inadequate stall warning system. According to expert testimony produced by plaintiffs, the stall resulted in a nonrecoverable flat spin caused by the undue spinning tendency of the airplane. Plaintiffs' witness surmised that Miro had feathered the left engine propeller because a valve in the left engine had failed, causing the instrument that measured oil to show a low operating pressure. In these circumstances, the propeller had to be feathered quickly to prevent the engine from coming apart, and to avoid a fire.

A test pilot who tested a Travel Air in preparation for the trial testified on behalf of plaintiffs that, with only one engine operating, the stall characteristics of the Travel Air were dangerous because of an undue tendency of the airplane to spin. He testified also that the stall warning light was inadequate. It was his opinion that the Travel Air failed to comply with five specified safety regulations of the FAA.

Beech attributed the crash to pilot error. Its witnesses testified that Miro had failed to maintain sufficient speed to prevent the airplane from entering into a nonrecoverable stall.

The FAA had certified the design of the Travel Air as complying with all applicable safety regulations. The aircraft first received a type certificate in 1957, after Beech employees conducted various inspections and tests and submitted to the FAA details regarding the construction and design of the airplane. Beech did not conduct tests for the spinning characteristics of the Travel Air because Harold Hermes, then the regional chief of the FAA's flight test branch, interpreted the safety regulations as not requiring spin testing for twin engine aircraft. In 1958 a Travel Air crashed, and the Washington headquarters of the FAA ordered that the aircraft be tested for its spinning characteristics. The spin testing was performed by a Beech em-

---

[3]Suit was also filed against Avco-Lycoming, the manufacturer of the Travel Air's engine, on a strict liability theory, claiming a defect in the oil cover bypass valve. The jury found in favor of Avco-Lycoming.

[4]Other theories of recovery advanced by plaintiffs were Beech's negligence and strict liability for design defects in the Travel Air, strict liability for Beech's failure to meet FAA safety standards for single engine stalls, single engine climb rate, and spin characteristics, and negligence for Beech's failure to adequately warn pilots of the Travel Air's "undue spinning tendencies" during single engine stalls.

ployee, accompanied by a FAA test pilot. Following the test, FAA officials, including the test pilot, recommended that the certification for the Travel Air be continued, finding that it complied with all applicable safety regulations. This recommendation was accepted by the agency.

At the conclusion of a four-month trial, the court read to the jury five FAA safety regulations that plaintiffs alleged Travel Air failed to meet, and instructed that the jury must find Beech negligent if they found that the regulations were violated and that the violations proximately caused decedents' injuries, unless Beech justified its failure to comply. (BAJI No. 3.45 (6th ed. 1977).) After two weeks of deliberations, the jury returned a general verdict against Beech; two jurors voted in Beech's favor.

On this appeal from the ensuing judgment Beech claims that the court erred in instructing the jury on the doctrine of negligence per se, in admitting various items of evidence, and in refusing to grant Beech's motion for a new trial because of alleged jury misconduct.

Beech does not challenge the sufficiency of the evidence to support the verdict on any of the theories of recovery advanced by plaintiffs. Nor does it assert that the jury should have been prohibited from giving any consideration to the question of Beech's compliance with the FAA safety regulations. It concedes that satisfaction of the FAA standards would not constitute a complete defense and the jury could have found Beech liable for defective design of the Travel Air even if it had complied with the FAA regulations, because the jury could have determined that such compliance was insufficient to absolve Beech's duty as a manufacturer. (See *Wilson* v. *Piper Aircraft Corp.* (1978) 282 Ore. 61 [577 P.2d 1322, 97 A.L.R.3d 606].)

Rather, Beech's claim is that the jury should have been compelled to give determinative effect to the FAA decision that the Travel Air complied with all applicable safety regulations, and that it was error to give the negligence per se instruction to the effect that Beech was guilty of negligence if the Travel Air did not meet the regulations. Beech urges that the effect of the instruction was to allow the jury to second-guess the FAA decision that the Travel Air complied with the regulations, thereby intruding into a field preempted by federal law.

The FAA is required by the Federal Aviation Act of 1958 to adopt minimum standards governing the design, construction and performance of aircraft. (49 U.S.C. § 1421 (a)(1).) It has issued detailed regulations setting forth safety standards and the requirements that must be met by an airplane as to both design and testing before a type certificate may be issued. (14 C.F.R. § 21.1 et seq. (1984).) The act authorizes the agency to delegate to

any properly qualified person the examination, inspection and testing necessary to the issuance of a certificate. (49 U.S.C. § 1355 (a).) Pursuant to that authorization the agency has permitted manufacturers to perform the tests necessary to assure that the regulations are met, and that the aircraft complies with all certification requirements. (14 C.F.R. §§ 21.21, 21.35.)

An experienced manufacturer with employees qualified in the various aspects of airplane design may qualify for the "delegation option" program, which allows the manufacturer's employees to act on behalf of the FAA to assure that all the appropriate tests and inspections for certification are performed. This procedure avoids the necessity for FAA personnel to repeat the tests and inspections required for certification. The manufacturer notifies the FAA whether the aircraft complies with safety regulations. The function of the FAA is largely to police compliance with the regulations, although it may perform the testing of an aircraft with its own personnel. (*Id.*, § 21.33; *United States* v. *S.A. Empresa de Viacao Aerea Rio Grandense* (1984) — U.S. —, — [81 L.Ed.2d 660, 675-677, 104 S.Ct. 2755, 2766-2767].) Beech was authorized by the FAA to act in accordance with the "delegation option" procedure.

■ Under the doctrine of preemption, federal law prevails over state law if Congress has expressed an intent to occupy a given field in which federal law is supreme. But even if there is no such intent, state law is preempted if it conflicts with federal law so that it is impossible to comply with both, or if the state regulations stand as an obstacle to the accomplishment of the full purposes that Congress sought to achieve. (*Pac. Gas & Elec.* v. *Energy Resources Comm'n.* (1983) 461 U.S. 190, 203-205 [75 L.Ed.2d 752, 765, 103 S.Ct. 1713, 1722].) ■ Courts are reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it. (*Exxon Corp.* v. *Governor of Maryland* (1978) 437 U.S. 117, 132 [57 L.Ed.2d 91, 104, 98 S.Ct. 2207]; *New York Dept. of Social Services* v. *Dublino* (1973) 413 U.S. 405, 413 [37 L.Ed.2d 688, 694-695, 93 S.Ct. 2507].)

■ Applying these principles to the present case, we begin with the observation that there is nothing inherently inconsistent in the proposition that even if the federal government has entirely occupied the field of regulating an activity a state may simultaneously grant damages for violation of such regulations.

This precept was recognized in the recent decision in *Silkwood* v. *Kerr-McGee Corp.* (1984) 464 U.S. 238 [78 L.Ed.2d 443, 104 S.Ct. 615]. The court there acknowledged the "tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion

that a state may nevertheless award damages based on its own law of liability," but held that in the field of nuclear safety regulation "Congress intended to stand by both concepts and to tolerate whatever tension there was between them." (*Id.* at p. 256 [78 L.Ed.2d at p. 457, 104 S.Ct. at p. 625].)

In *Silkwood* the federal government had enacted regulations concerning the safety of nuclear power plants and the licensing of such plants. These regulations occupied the field of safety to the exclusion of state enactments on the subject. Nevertheless, the high court ruled that common law tort principles of Oklahoma law were applicable to hold the defendant employer liable to an employee for compensatory and punitive damages as the result of radiation at the defendant's plant.[5] After a close analysis of the legislative background of federal laws relating to nuclear power, the court concluded that Congress had assumed persons injured by nuclear accidents were free to utilize state court remedies, and that "traditional principles of state tort law would apply with full force unless they were expressly supplanted." (*Id.* at p. 255 [78 L.Ed.2d at p. 457, 104 S.Ct. at p. 625].)

Here, there can be no question as to the intent of Congress to allow the states to apply their own laws in tort actions against aircraft manufacturers for the defective design of airplanes, in spite of the fact that federal law may have completely occupied the field of regulation of aircraft safety and certification. The Federal Aviation Act of 1958 expressly declares that its provisions are not intended to abridge remedies that a party may have under state law. (49 U.S.C. § 1506.) The doctrine of negligence per se is one of those remedies.

Since Congress has clearly allowed state tort remedies, the critical issues before us are not whether it has fully occupied the field of aircraft regulation, but whether there is an "irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law." (*Silkwood,* 464 U.S. at p. 256 [78 L.Ed.2d at p. 458, 104 S.Ct. at p. 626].)[6]

We can discern here no irreconcilable conflict between federal and state standards. Plaintiffs do not challenge the power of the FAA to adopt safety

---

[5]In *Silkwood* the plaintiff made no claim under the doctrine of negligence per se, but alleged strict liability and common law negligence.

[6]The holding of *Silkwood* does not mean, of course, that a state damage remedy is always available when Congress has occupied a regulatory field. Beech relies on *Chicago & N. W. Tr. Co.* v. *Kalo Brick & Tile Co.* (1981) 450 U.S. 311 [67 L.Ed.2d 258, 101 S.Ct. 1124], which holds that a state may not allow the imposition of damages against a carrier for the abandonment of a rail route if Congress has authorized the abandonment on a showing of reasonableness in a proceeding before the Interstate Commerce Commission and the commission has decided the issue in the carrier's favor. The case at bar is readily distinguishable: Congress has allowed a state damage action for violation of FAA regulations, plaintiffs had no interest in the certification process as such at the time it occurred, and as we shall see, there is no inconsistency between the jury verdict and the FAA certification.

regulations or to certify aircraft as complying with those regulations. Nor do they seek to revoke the certification of the Travel Air. Even if the jury found that the Travel Air was defective on the basis of the negligence per se instruction, this would have no effect on the FAA's power to certify aircraft, or on the validity of its certification decisions. It is important to note that the negligence per se instruction plays a very limited role in the context of a state court's obligation to accord deference to the FAA's decisions regarding the safety of aircraft. In essence, it allows the jury to find defective an airplane design that the FAA has approved as safe. But a jury may make the same determination without the instruction because, as Beech concedes, it could find a manufacturer liable for defective design even if the airplane complies with every regulation. The negligence per se instruction therefore affects only the jury's *reason* for finding a design defect, rather than its power to find such a defect in the face of FAA certification.

In many respects this case is stronger for plaintiffs on the issue of conflict between federal and state law than *Silkwood*. There, the federal government had the authority to impose civil penalties against a licensee for violation of nuclear radiation standards. Nevertheless, the court held that a state tort remedy did not raise a conflict because it would not be physically impossible for defendant to pay both the federal fine and the state-imposed damages. (*Silkwood, supra,* 464 U.S. at p. 257 [78 L.Ed.2d at p. 458, 104 S.Ct. at p. 626].) We cannot say here that allowing the jury to find Beech guilty of negligence per se "create[s] a significant risk of prohibition of protected conduct, . . ." (*Sears, Roebuck & Co.* v. *Carpenters* (1978) 436 U.S. 180, 207 [56 L.Ed.2d 209, 232, 98 S.Ct. 1745].)

The final question to be analyzed is whether state law poses an obstacle to the federal regulatory scheme. Again, we cannot conclude that the administration of the certification program is threatened by allowing a state to hold a manufacturer liable under negligence per se principles. If anything, the converse is true. As we have seen, the certification program is largely administered by the manufacturer, which develops the plans and performs the tests to assure that the design complies with safety regulations. Although the FAA also has the power to perform tests, its basic function is to police the manufacturer's compliance. An inquiry in a state court into whether the manufacturer in fact complied with the regulations, such as the extensive testimony in the present case of post-accident flight tests of the Travel Air and the relation of the results of those tests to the requirements of the safety regulations, would assist the FAA in policing a manufacturer's compliance rather than hampering the agency in this regard.[7]

---

[7]Plaintiffs devote a considerable portion of their briefs to the process by which the Travel Air was certified, claiming that it amounted to "self-certification." We do not understand these references as a challenge to the federal government's right to allow manufacturers primary responsibility to assure compliance with the regulations (49 U.S.C. § 1355 (a)) but, rather, as an attempt to support plaintiffs' argument that Beech was liable for the defects in question despite FAA certification.

We agree with the observation of a federal court that the "complex and exacting scheme of regulation developed by the FAA . . . must be reinforced and strengthened by courts called on to develop rules of liability and damages in situations . . . where it is apparent that high standards consistent with the regulatory scheme have not been maintained with resulting injury to persons and property." (*Fisher* v. *Bell Helicopter Company* (D.D.C. 1975) 403 F.Supp. 1165, 1172.) A rule that allows the jury to consider whether a manufacturer of airplanes complied with FAA safety regulations is in keeping with this objective.

The purpose of the regulations is to protect those who fly in airplanes or are affected by their flight. (See, e.g., *Arney* v. *United States* (9th Cir. 1973) 479 F.2d 653, 658; *Rauch* v. *United Instruments, Inc.* (3d Cir. 1976) 548 F.2d 452, 457; *In re Air Crash Disaster Near Silver Plume, Colo.* (D.Kan. 1977) 445 F.Supp. 384, 400; *Starr* v. *United States* (N.D.Tex. 1975) 393 F.Supp. 1359, 1364.)[8] This goal would be enhanced rather than defeated by allowing a jury to consider whether the design of an aircraft complies with safety regulations. If, for example, a manufacturer (with or without the presence of an FAA inspector) failed to perform the tests required to assure that an airplane design met safety regulations, the public safety would not be promoted by precluding a jury from considering whether there was compliance, on the ground that the agency had issued a type certificate. A state court investigation of the issue in the context of an action for damages promotes the safety of the traveling public by revealing violations or defects which may not have come to the attention of the FAA at the time it issued the certificate.

The possibility of error in certification is more than an abstruse theory. In the present case, the Travel Air was not spin tested in 1957 because an FAA official interpreted the safety regulations as not requiring such a test. After a Travel Air crashed in 1958, the Washington headquarters of the agency advised the region that the regulations required spin testing, and the aircraft was in fact tested, as described above.

Beech insists that the only remedy available to a party who claims that an aircraft design does not comply with safety regulations is to bring an action in the federal district court within 60 days of the issuance of a type certificate to challenge certification (49 U.S.C. § 1486 (a); *O'Donnell* v. *Bond* (D.D.C. 1981) 510 F.Supp. 925, 931), or to initiate a complaint before the FAA itself (49 U.S.C. § 1482 (a)). These statutes allow review or investi-

---

[8]We reject Beech's claim that the purpose of the safety regulations is primarily to guide the FAA in making decisions regarding the issuance of type certificates. As should be obvious, and as the cases cited above establish, the regulations are aimed at protecting the public.

gation of FAA orders, including certification orders. But the object of plaintiffs in this lawsuit was not to revoke the certificate of the Travel Air or to require that additional tests be performed, and they did not directly challenge the FAA's issuance of the certificate. The statutes relied on by Beech provide no damage remedy to the traveling public for improper certification. A passenger on an airplane cannot be expected to investigate the basis on which the aircraft was certified before he embarks on a journey; the practical impact of barring an action for damages would be that the very persons for whose protection the regulations were designed would be denied a remedy for their violation.

The parties cite numerous cases in support of their respective positions. Plaintiffs rely on cases holding that the negligence per se doctrine applies to FAA regulations, while Beech cites cases which it claims hold to the contrary. With the exception of *McGee* v. *Cessna Aircraft Co.* (1983) 139 Cal.App.3d 179, 186-187 [188 Cal.Rptr. 542], these cases are not directly relevant to the issue before us.[9] In *McGee,* it was recognized in a case alleging a design defect that FAA safety regulations are entitled to as much weight as statutes and ordinances for the purpose of section 669 of the Evidence Code. While the holding of *McGee* favors plaintiffs, the opinion does not discuss the preemption issue.

For the foregoing reasons we hold that Beech has failed to meet its burden of proving that the doctrine of preemption precluded the jury from finding Beech liable for negligence in the design of the Travel Air on the basis of its violation of FAA safety regulations.

■ Beech also contends that the negligence per se instruction allowed the jury to focus its attention on whether the FAA was justified in delegating responsibility for certain steps in the certification process to Beech, rather than on whether the Travel Air was defective. It cites statements from the argument of plaintiffs' counsel to the jury asserting that the FAA was not doing its job by allowing Beech to assume primary responsibility for certifying the Travel Air. The instruction, however, did not mention Beech's

---

[9]The remaining cases cited by plaintiffs are not helpful since for the most part they do not relate to airplane design but to operational safety standards regulating the conduct of flight crews and air controllers. (E.g., *Gatenby* v. *Altoona Aviation Corporation* (3d Cir. 1968) 407 F.2d 443; *Rudelson* v. *United States* (C.D.Cal. 1977) 431 F.Supp. 1101; *Todd* v. *United States* (M.D.Fla. 1975) 384 F.Supp. 1284.) The issue of a conflict between FAA certification of design and a jury's award of damages based on alleged violation of FAA regulations is not involved in these decisions.

Beech cites two cases for the proposition that a negligence per se instruction cannot be based on the violation of FAA regulations, but in one it was held that the defendants had not violated the regulations (*Fisher* v. *Bell Helicopter Company, supra,* 403 F.Supp. 1165, 1174), and in the other the regulation was advisory rather than mandatory (*Diamond* v. *Grow* (1966) 243 Cal.App.2d 396, 401 [52 Cal.Rptr. 265]).

role in the certification process; and Beech waived any right to complain of counsel's argument by its failure to object and ask for an admonition. (*Warner Constr. Corp.* v. *City of Los Angeles* (1970) 2 Cal.3d 285, 302-303 [85 Cal.Rptr. 444, 466 P.2d 996].)

Beech next complains of certain evidentiary rulings. ■ First, it asserts that the court erred in allowing plaintiffs to cross-examine Hermes, the former FAA official who testified regarding the certification of the Travel Air, as to the contents of a report to a congressional subcommittee.[10] The report referred to a study performed by an unidentified employee of the General Accounting Office which allegedly showed that Beech and other aircraft manufacturers had failed to carry out their responsibilities in connection with the certification process. The court admitted the report, over Beech's objection, after plaintiffs conceded its hearsay character but claimed that it was both relevant and admissible under the "official records" exception to the hearsay rule. (Evid. Code, § 1280.)[11]

Plaintiffs' attorney then read from the study a statement that in 1971 FAA officials considered withdrawing Beech's authorization to participate in the certification process because Beech (1) had concealed known certification problems; (2) had engaged in prolonged and unresponsive discussions with the FAA concerning its requirements; (3) was reluctant to disclose certification-relevant material; (4) followed unconventional flight test techniques; and (5) did not properly evaluate technical references to earlier design. Plaintiffs' attorney asked Hermes whether he agreed with these evaluations, and Hermes testified that he did not.

This same report was excluded as hearsay in *Baker* v. *Beech Aircraft Corp.* (1979) 96 Cal.App.3d 321, 338-339 [157 Cal.Rptr. 779], on the ground that there was no evidence as to the identity and qualifications of the individuals who prepared it, the facts upon which they based the report, or the circumstances under which it was prepared.

Beech claims that not only was the report inadmissible as hearsay (*Love* v. *Wolf* (1964) 226 Cal.App.2d 378, 403 [38 Cal.Rptr. 183]), but its con-

---

[10]Hermes testified on direct examination that Beech had qualified as the designated representative of the FAA because of its honesty and integrity. The report assertedly challenged this testimony.

[11]Section 1280 of the Evidence Code provides:

"Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:

"(a) The writing was made by and within the scope of duty of a public employee;

"(b) The writing was made at or near the time of the act, condition, or event; and

"(c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

tents were irrelevant, as it related to an opinion of FAA officials in 1971, seven years after Hermes left his position at the FAA's central regional office, where his contacts with Beech had occurred, and thirteen years after the Travel Air was certified.

We agree with Beech that the court should not have allowed plaintiffs to read from the document in their cross-examination of Hermes. The third prong of the "official records" exception to the hearsay rule is that the "sources of information and method and time of preparation" of the record must be "such as to indicate its trustworthiness." (Evid. Code, § 1280, subd. (c).) Since the author of the study and the identity of the FAA officials who considered cancellation of Beech's certification authorization were unknown, and the study was made several years after Hermes' contact with Beech in the FAA central region had terminated, its trustworthiness and relevance were questionable. Thus, the study did not come within the exception to the hearsay rule for official records set forth in section 1280 of the Evidence Code.

■ We cannot conclude that the error was prejudicial, however. While these accusations tended to place Beech in an unfavorable light in the eyes of the jury, they referred to Beech's conduct in relation to certification in a general sense, without regard to the certification of any specific airplane. Moreover, the accusations against Beech were made 13 years after the Travel Air was certified, thereby diminishing its apparent relevance. On the other hand, there was voluminous testimony regarding the testing of the Travel Air, Beech's relationship to the FAA during the certification process, the requirements of the safety regulations, and the respects in which Beech failed to comply with them. This evidence was ample to support a determination by the jury in plaintiffs' favor, and it is doubtful whether the few references to the report during a four-month trial were a serious detriment to Beech. Under all the circumstances, we cannot conclude it is reasonably probable that a result more favorable to Beech would have been reached absent the references to the report at trial. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

■ Another asserted error was the admission of evidence of other accidents involving aircraft built by Beech. Over Beech's objections, the court allowed plaintiffs to cross-examine Hermes regarding 20 stall/spin accidents of Beech aircraft; 15 of these involved the Baron, another model built by Beech, and 5 the Travel Air.[12]

---

[12]Beech argues that it was error to receive evidence of four of these twenty accidents involving the Baron on the ground that it was cumulative because they had been previously described to the jury. Whether or not this ruling was error, it was harmless under *Watson*.

■ Evidence of prior accidents is admissible to prove a defective condition, knowledge, or the cause of an accident, provided that the circumstances of the other accidents are similar and not too remote. (*Ault* v. *International Harvester Co.* (1974) 13 Cal.3d 113, 121-122 [117 Cal.Rptr. 812, 528 P.2d 1148, 74 A.L.R.3d 986].) ■ Beech contends the other accidents were dissimilar to the event in the present case in a number of respects: most of the accidents occurred in the Baron, an airplane different from the Travel Air; although they all involved the stall and spin of the aircraft, there was no evidence whether the airplanes entered the spin from a single engine stall, such as occurred in the present case; and other factors such as pilot error or overloading might have been responsible for the accidents.

Plaintiffs introduced expert testimony that the defect in the design of the Travel Air was in its wings, which caused the aircraft to spin unduly in a single engine stall; that the Baron had the same design defect; and that this common characteristic produces identical single engine stall/spin characteristics. This evidence of the similarity in the design of the Baron and the Travel Air was sufficient to justify the court's conclusion that evidence regarding accidents in the Baron was admissible.

Moreover, even if the accidents did not occur in precisely the same manner as in the present case, testimony regarding the accidents that occurred prior to the crash of the Travel Air in this case was admissible to show that Beech had notice of a dangerous condition.[13] ■ For this purpose, " ' "all that is required . . . is that the previous injury should be such as to attract the defendant's attention to the dangerous situation. . . ." ' " (*Hasson* v. *Ford Motor Co.* (1982) 32 Cal.3d 388, 404 [185 Cal.Rptr. 654, 650 P.2d 1171].) ■ There can be no question that the prior accidents should have alerted Beech to the faulty spinning characteristics of the Travel Air. It was contrary to FAA regulations to spin either the Baron or the Travel Air, and Beech should therefore have been alerted to the fact that the spinning of the airplanes in the prior accidents was unintentional and may have been due to a defect in their design.[14]

---

[13]We recognize that only 13 of the accidents on the list of 20 occurred prior to the accident in the present case, and only these accidents could have provided notice to Beech of a defect. Nevertheless, the admission of evidence of all 20 accidents was not prejudicial. Prior to the examination of Hermes regarding these 20 accidents, the court admitted evidence regarding 4 additional accidents involving the Travel Air. Thus, the overall effect was only that the jury learned about 24 accidents, only 17 of which occurred before the crash of the Travel Air in this case.

[14]We also reject Beech's claim that the court improperly allowed plaintiffs to refer to a report of flight tests performed by the United States Army of the Beech T-42A model, the military version of the Baron. The pilot who had performed the tests and expressed his opinion of the reactions of the airplane in the report had died prior to the trial. Beech

Beech's final argument is that the court erred in denying its motion for a new trial on the ground of jury misconduct. The jury began its deliberations on January 2, 1980, and returned its verdict on January 14. On December 30, during the Christmas recess, the television series "60 Minutes" broadcast a program criticizing the safety record of light aircraft.

On February 25 a juror who had voted in Beech's favor signed a declaration stating that two jurors had "indicated that they had seen the program."[15] No counteraffidavits were filed. Beech argued in its motion for a new trial that this event amounted to prejudicial misconduct. The court viewed a videotape of the broadcast, and a transcription of the tape was appended to Beech's motion for a new trial.

During the broadcast, the participants made a number of references to pilot error as the cause of air crashes. In denying Beech's motion for a new trial the court observed that "it would be hard to say who . . . [the broadcast] hurt the most or who it hurt the least. There was certainly more than a passing reference to pilot error, and frankly, my own view is that Beech didn't come off all that bad. . . . I think someone would walk away from that program thinking that most of these crashes are caused by pilot error. . . . [M]any comments were that these people just do not have the wherewithal to be able to fly these airplanes safely." The court stated that it had instructed the jury to set aside any extrinsic "evidence," and "the mere fact that a juror without meaning to is made aware of something with respect to the same subject matter outside the courtroom does not mean that he is taking evidence because I think they were adequately advised . . . that the evidence comes from the witnesses who . . . testify from the witness stand under oath. I don't have any doubt in my mind but what the jurors were clear on that subject."

Beech argues that the two jurors who viewed the program were guilty of misconduct, and that such misconduct raises a presumption of prejudice.

---

objected to the report on the ground that it was hearsay, and plaintiffs later withdrew it from evidence; but they used the contents of the report in cross-examining witnesses, and referred to it in closing argument. A witness who monitored the pilot's actions in the cockpit and read the instruments during the test, and who was a coauthor of the report, testified at some length concerning the tests. We cannot say that the court erred in finding that he was sufficiently knowledgeable about the tests to allow the use of the report in the examination of witnesses.

[15]Plaintiffs argue in their briefs that the juror's declaration was inadmissible as hearsay, and that Beech's attorney's affidavit that he did not have knowledge of the conduct of the jurors until after the verdict was insufficient because Beech did not also disclaim such lack of knowledge. (*Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 103 [95 Cal.Rptr. 516, 485 P.2d 1132].) Whatever the merit of these assertions, the record does not establish that plaintiffs raised them in the trial court, and they must therefore be deemed waived.

(*People* v. *Pierce* (1979) 24 Cal.3d 199, 207 [155 Cal.Rptr. 657, 595 P.2d 91].) In support of its assertion, it cites cases in which a juror deliberately received evidence outside the courtroom. (E.g., *People* v. *Pierce, supra,* 24 Cal.3d 199 [juror discussed trial with prosecution witness]; *Anderson* v. *Pacific Gas & E. Co.* (1963) 218 Cal.App.2d 276 [32 Cal.Rptr. 328] [juror independently visited scene of accident]; *Kritzer* v. *Citron* (1950) 101 Cal.App.2d 33 [224 P.2d 808] [juror asked for outside medical opinion in malpractice case].)

Here, however, the jurors in question did not deliberately set out to discover information regarding the issues at the trial; they simply watched a popular television program that happened to discuss the subject matter of the trial in a general way. The conduct of these jurors was comparable to that described in *Hasson* v. *Ford Motor Co., supra,* 32 Cal.3d 388, 408-409. *Hasson* was a products liability case in which several acts of juror misconduct were alleged by Ford. One was that a juror who attended night-time paralegal classes during the trial heard a lecturer discuss a successful action against Ford for products liability involving another Ford model. The lecturer told the class that Ford was subjected to punitive damages because it had deliberately abstained from modifying the automobile to make it more safe in order to save money. We held this did not amount to misconduct because the juror did not deliberately solicit the statements but "inadvertently attended a single class where the subject of an arguably related piece of litigation was mentioned in passing." (*Id.* at p. 409.)

But even if we were to agree with Beech that the jurors committed misconduct by watching the program and that a presumption of prejudice arose as a result (*People* v. *Pierce, supra,* 24 Cal.3d 199, 207), the presumption was rebutted. ▉ In *Hasson* we set out the test to be applied in determining whether juror misconduct resulted in prejudice. The court must examine the record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. Some of the factors to be considered in this connection are "the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued." (32 Cal.3d at p. 417.)

▉ An examination of these matters leads us to the same conclusion as the trial court, i.e., that no prejudice resulted from the conduct of these jurors. Evidence of misconduct was not convincing, to say the least. It consisted of the affidavit of one juror that "two jurors indicated that they had seen the program." The affiant was uncertain of the identity of one of these jurors; there is no indication that either juror saw the whole program;

and the declaration lacks specificity regarding the actual statements of the two jurors, and the circumstances under which they were made.

The misconduct, if it occurred, was not serious in the sense of revealing a deliberate act by the two jurors in violation of instructions to confine their consideration of the case to the evidence they heard in the courtroom. There was no way for the jurors to know in advance that Beech's name would be fortuitously mentioned in the broadcast, or that the relationship between airplane manufacturers and the FAA would be discussed, or indeed the subject matter of this weekly television show.

Most important, it is highly unlikely that the jurors were prejudiced by viewing the program. The remarks of the two jurors that they had viewed the program were not made in the jury room; and the broadcast made no reference to the Travel Air or to the accident in issue here.

Finally, we have read the transcript of the "60 Minutes" broadcast, and, like the trial court, we are unable to conclude whether it favored plaintiffs' theory of a design defect in the Travel Air or Beech's claim of pilot error. In our view, any misconduct was not "of such a character as is likely to have influenced the verdict improperly." (Evid. Code, § 1150, subd. (a).)

The judgment is affirmed.

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.

Appellant's petition for a rehearing was denied January 16, 1985.