[No. B082456. Second Dist., Div. Seven. Dec. 8, 1995.]

ELKE SOMMER, Plaintiff and Respondent, v.
ZSA ZSA GABOR et al., Defendants and Appellants.

**COUNSEL**

Hughes Hubbard & Reed, William T. Bisset, Lois Moonitz Jacobs and Colleen M. Ryan for Defendants and Appellants.

Shapiro, Rosenfeld & Close and Julie J. Bisceglia for Plaintiff and Respondent.

**OPINION**

**LILLIE, P. J.**—Defendant Zsa Zsa Gabor and her husband, defendant Frederic Von Anhalt, appeal from a judgment on a special verdict in favor of plaintiff Elke Sommer in her action for defamation. On appeal, defendants contend the court erred in (1) applying California, rather than German, defamation law; (2) instructing the jury; and (3) admitting evidence the defamation caused distress to Sommer's mother. Defendants also contend that the statements attributed to them are opinions and are not actionable as a matter of law, and that the damages are excessive.

### FACTS

Sommer, who was born in Germany in November 1940, began playing the romantic lead in films in Europe in 1958; in 1962, she made an American

movie filmed in London; in 1963 she made her first Hollywood movie and played the lead with Paul Newman. From 1958 to 1991, Sommer made about 67 films; in the early 1970's, she began television work and live theater; although Sommer made no movies in Hollywood from 1983 to 1990, she appeared in stage productions and television series. According to her publicist in the 1960's, Richard Guttman, press coverage affects the reputation of a celebrity. Sommer's reputation as an actress is international and is of someone "attractive, charming, pleasant. Someone you are going to have in your house." Such a reputation must be maintained by positive publicity, not through negative publicity.

In the February 22, 1990, issue of the German language weekly magazine, Freizeit Revue, a "women's publication" with a worldwide circulation of about 1,300,000, including 310 in Southern California, writer Anna Amlong reported that Zsa Zsa Gabor (Gabor) said that Sommer is broke, had to sell her house in Hollywood, now lives in the worst section, hangs out in sleazy bars, lives from selling her handknit sweaters for $150, and nobody wants to have anything to do with her anymore. The article also attributed to Gabor a statement that she (Gabor) found "offending," a statement Sommer allegedly had made six years earlier after one of Gabor's performances on a horse, that "Zsa Zsa has such a big behind that she could not even manage to get on the horse by herself." The article in Freizeit Revue also reported that Sommer was upset by Gabor's statements and Sommer said that knitting was a hobby and that she had assets worth 30 million German marks.

According to Anna Amlong, a journalist for Freizeit Revue, she was in the lobby of a hotel in Germany where Gabor was also staying during rehearsals for a show; Amlong and a free-lance photographer sat down at a breakfast table with Gabor and Von Anhalt; the photographer took pictures of Gabor; Von Anhalt, who had known Amlong for a long time, introduced Amlong to Gabor as a journalist; Amlong spoke to Von Anhalt and Gabor in German; Gabor spoke fluent German; Amlong brought up the subject of Sommer, and Gabor kept talking about her; Amlong told Gabor that "it was extremely interesting and that would make a good story." Gabor told Amlong that it would not matter, that "Sommer was so ruined that it would not matter." Von Anhalt also said the whole thing "was even worse, that Ms. Sommer was completely ruined and broke and also that . . . she hardly had any hair on her head. And she would be at least 60 years old." Amlong spoke to Sommer by telephone before the article was published; Sommer told her that all the information given by Gabor was incorrect and provided true details of her financial situation.

Sommer's business manager testified that in February 1990, and in 1992, Sommer was not broke and her bills were being paid on time. Sommer

admitted, however, that she was suing her former United States business manager for mismanagement; in July 1992 she did not have enough ready cash in the United States to make a large purchase, but she still had a house and cash in Germany, and a condo in Spain.

According to Sommer, when a woman reporter telephoned her at her home in California and told her about Gabor's statements in February 1990, she hung up the phone and started crying; she was in terrible shock, "like I got stuck between two trucks," and "did not want to believe that somebody could just say something like that about another human being." Sommer told the reporter that there was no truth to the statements. According to Sommer, the statements were "demeaning, taking all your little bit of dignity away." Sommer suffered sleeplessness, headaches, and was sick to her stomach; she saw a psychiatrist twice.

According to Von Anhalt, he was the one who spoke to Amlong about Sommer; Gabor did not talk to Amlong about Sommer and Gabor was not familiar with the German dialect spoken by Amlong. Von Anhalt made statements about Sommer, but "not the way it was written, no"; he denied saying anything except that he never sees Sommer in their group of friends or society in America and she was not doing very much lately.

Gabor denied saying anything about Sommer "in my life in the press," and denied being interviewed by any reporter from Freizeit Revue. Gabor testified that she did not learn about the statements attributed to her until Sommer sued her. Gabor admitted that in 1990, she did not know whether Sommer was broke, whether she goes to bars, where she lived, whether she sold her house, whether she knits, and whether or not anyone in Hollywood wants to have anything to do with her.

In April 1990, a German language daily newspaper, Bild, with a daily circulation in Germany of about 3,900,000, asked a foreign correspondent, Carolin Dendler, in Los Angeles, to talk to Von Anhalt to get both sides of the story about Gabor and Sommer; Dendler talked to Von Anhalt by telephone and sent a memo of her interview to Bild. According to Dendler, Von Anhalt told her that Sommer could not buy a $500 ticket for a charity benefit, Sommer's bills were not being paid, in Hollywood no one recognizes her on the street anymore, Sommer was lying about her age in that she was not 48 but 62, and that Sommer looks like a 100-year-old grandmother. Articles in the German daily newspaper Bild on April 28 and 30, 1990, reported the foregoing statements by Von Anhalt, in addition to attributing

the statement to him that he saw Sommer recently and she has almost no hair left on her head.[1]

Von Anhalt, who subscribed to Bild and talked to them every day, admitted giving interviews to Dendler in April 1990. He admitted telling Bild that Sommer was 62 years old, and that Sommer looked like a 100-year-old grandmother; he denied making all other statements which Bild attributed to him. He also testified that his statement about the 100-year-old grandmother came from a picture of Sommer in either the Star or National Enquirer magazine; he did not know Sommer's real age.

Sommer testified that she was devastated by the Bild articles, which intensified her earlier distress, insomnia and "incredible uneasiness"; at trial, she still suffered from the same symptoms; but "sometimes if I get lucky they are gone a week or ten days that [I] don't think about it constantly."

Sommer's mother testified that she keeps fan mail for Elke at her home in Germany; after publication of the articles with defendants' statements, Elke got about 200 fan letters, some offering to help her. According to Sommer, her reputation in Germany "crosses the ocean."

Although Sommer admitted that no employer ever told her that she was not hired because of the articles, publicist Richard Guttman testified that it is common for actresses not to know what work they lost as a result of negative publicity; the statements published in Freizeit Revue and Bild were damaging to Sommer's reputation as an actress. The statement that no one wants to have anything to do with her is damaging because "the thing that creates the best work atmosphere, employment atmosphere, is the knowledge that people do want to have something to do with you; so if you are presented in disregard, then other people tend to disregard you." The statement that Sommer lied about her age and that she was 62 was damaging because "she's an actress who has always had a highly sexual identification. She's certainly a glamour star, and one tends to be regarded less glamourously as you get older."

The issue of punitive damages was bifurcated from all other issues and tried to the jury last. After instructions on defamation, general damages, and malice, the jury rendered a verdict finding in favor of Sommer and against Gabor and awarding Sommer general damages of $800,000; the jury also

---

[1] Although Dendler testified that Von Anhalt did not make any statement about Sommer's hair to her, Anna Amlong testified that Von Anhalt made the statement to her. Although that statement did not appear in the article in Freizeit Revue, Amlong testified that she talked to her colleagues about Von Anhalt's statements, but did not recall to which particular colleague she gave what information.

found in favor of Sommer and against Von Anhalt and awarded Sommer general damages of $1.2 million against him. The jury also returned a special finding that, by clear and convincing evidence, both defendants were guilty of malice in the conduct upon which the jury had based its finding of liability for defamation.

Trial then continued as to the issue of punitive damages. Gabor admitted that her net worth was $6.2 million, although she was then living off of her capital, not income; her liquid assets were only $165,000. Von Anhalt testified that he had assets in Europe worth 2.5 million German marks; he also owned 51 percent of a champagne business which he purchased in 1982 for 1.5 million German marks. German news companies also pay him about $60,000 per year for news. After instruction and deliberation, the jury returned verdicts awarding Sommer punitive damages of $450,000 against Gabor and $850,000 against Von Anhalt. A judgment on a special verdict was entered against Gabor for a total of $1,250,000 and against Von Anhalt for a total of $2,050,000.

Defendants moved for new trial on numerous grounds, including excessive damages, insufficiency of the evidence, erroneous jury instructions, and error in failing to apply German law to plaintiff's claims. The court denied the motion for new trial. Defendants filed timely notice of appeal from the judgment.

I

No Error in Failing to Apply German Law of Defamation

Appellants contend that the trial court erred in applying California defamation damages law and "in refusing to apply German defamation damages law that would have precluded recovery of presumed and punitive damages."

Respondent contends that appellants failed properly to raise the choice of law issue in the trial court, and in any event, the court properly applied California law to the action.

According to our record, appellants first addressed the choice of law issue in their reply to Sommer's opposition to a defense motion for judgment on the pleadings, which motion was made immediately before trial. Defendants argued that the defamatory nature of the expression should be tested by the law of the location where uttered, and "since the tort of libel occurs at the place of publication, the conflict law would require that German law be

applied." Defendants then asserted that "An injury to reputation is not actionable under German law," and because Sommer is a public figure, she has no cause of action under German law. Attached to the reply was an English translation of portions of the German Civil Code, as amended to January 1, 1975, and portions of an English language treatise on German private and commercial law published in 1982.[2] However, the portions of authorities provided by defendants were not current, complete, or thorough enough in their analysis to support their argument that Sommer would have no cause of action under German law.

At the time of oral argument on the motion for judgment on the pleadings, defense counsel remarked without elaboration that the substantive law of defamation was different in Germany, and one of the issues raised in the motion was whether or not the statements were actionable in Germany. Other issues were then discussed at the hearing, and the choice of law issue was not raised again before the court denied the motion for judgment on the pleadings.

Our record reveals that the next time defendants raised the issue, it was by oral motion out of the presence of the jury immediately before the defense rested.[3] Citing *Gallegos* v. *Union-Tribune Publishing Co.* (1961) 195 Cal.App.2d 791 [16 Cal.Rptr. 185], defendants argued that "the law of the

[2]Nowhere in the material provided is there any support for the claim that German law does not protect injury to reputation. The 1982 treatise states that "German law has several different ways of protecting a person's honor and reputation." The treatise also states that "A plaintiff who has established that his right of personality has been invaded is entitled to claim that the invasion be counteracted, as by the retraction of a defamatory statement, and that it not be repeated. Furthermore, if the defendant was at fault, the plaintiff may claim damages for any material harm he may have suffered. For a long time, however, the plaintiff could not obtain damages for harm to his feelings or for any other non-economic harm, since § 253 BGB unequivocally lays down that damages in respect of such harm may be ordained only in the cases prescribed by law, principally for corporeal injuries. Since 1958, however, the Bundesgerichtshof has disregarded the terms of this provision." With respect to public figures, the treatise states: "In the case of inaccurate, incomplete, biased, or defamatory newspaper reports, balancing the values of the right of personality on the one hand and the freedom of the press on the other is particularly delicate. Here the courts have always recognized that, in relation to politicians, publicists, and other persons in the public eye or 'questions of public importance', the press is entitled to go in for very severe and even one-sided criticism, whereas much sterner standards will be applied to the gratuitous publication of private or family affairs with names attached."

[3]Defendants made their oral motion regarding German law at the close of the case and in connection with a discussion on jury instructions. After plaintiffs had rested, defendants moved for a nonsuit based on issues arising under California law. After the court denied the nonsuit, defendants made their oral motion regarding application of German law. After the court denied the oral motion, and after lengthy discussions on the jury instructions, the defense recalled Von Anhalt to the stand briefly to clarify some points in his earlier testimony; the defense then rested. Thus, the motion was made essentially at the close of trial.

situs of the publication be used." Sommer's counsel responded in pertinent part that "we've gone through and tried most of the case and . . . I don't believe this is a correct statement of the law. First of all, in any event, with respect to Von Anhalt, the publication was here. Secondly, the normal conflict-of-law rule has to do with substantial interest, and I am not aware that there's any difference with respect to defamation law. Seems to me clearly California has a substantial interest in protecting the reputation of its residents. So I think on its face it doesn't make any sense . . . . [¶] . . . To make a seat-of-the-pants motion doesn't seem to be quite right."

Defense counsel asked the court to "defer till tomorrow morning" its ruling, and because the case came to a conclusion before he expected, he did not have an opportunity to prepare a written motion. Defense counsel also noted that the issue was raised before trial in defendants' reply to opposition to their motion for judgment on the pleadings. The trial court stated that the issue was not raised in a noticed motion. Defense counsel then stated that in connection with discussions on jury instructions, it was then proper to raise the choice of law issue and "I am making an application to this court to apply the substantive law of the situs at least as involves Zsa Zsa Gabor, and that law requires that there be special damages."

The court responded: "All right. According to Witkin, single publication rule where multi-state defamation [sic] the law of the state of some relationship is applied. That the person sues usually [in] the state [of] domicile at the time. If the matter was published in that state—and I believe the evidence and testimony is it shows it was at least one publication of each of the documents in this state. So I will apply the rule of California. . . . [¶] I think the real basis on which the court will apply the California law is that both plaintiff and defendant have principal domicile in California." Defense counsel then acknowledged that his clients' domicile is here, but defendants were not contesting jurisdiction, but raising a choice of law issue under *Gallegos*. The court responded that, "Publication took place where the item is published. It could be published in every state—in the case of newspapers where the newspaper is distributed it is published. . . . [¶] That is the ruling."

After defense counsel persisted, the court remarked: "Counsel, if you made this motion at the outset for a change of venue or something else, you know, I certainly would be more inclined to be sympathetic. But to make it after knowing all of the facts before going into this case, going through an entire trial and then coming and asking me to apply German law, it is a bit too excessive I would think." The court solicited comments from Sommer's counsel, who stated that the *Gallegos* case is a 1961 case and shortly thereafter "I remember substantial changes in the conflict-of-law rules in

California and elsewhere; and again, I am flying by the seat of my pants, but my recollection is that conflicts change substantially from the location of the wrong which is kind of what the *Gallegos* case is talking about, [to] significant relationships and important interests. . . . That's why I believe your Honor's ruling is correct."

In their briefs on appeal, appellants urge this court to conclude the trial court erred in its choice of law ruling under the governmental interests approach. However, appellants did not raise the issue of the governmental interest approach below; rather, they urged the trial court to decide an alleged conflicts of law issue essentially on the basis of *Gallegos*, a 1961 appellate court decision which, since 1967 did not state the applicable and proper law governing conflicts of law issues. Given the documents and arguments presented below, and the applicable standard of review, we conclude, as explained more fully below, that appellants have failed to establish any error on the part of the trial court in denying their oral motion to apply German law.

"In the landmark opinion authored by former Chief Justice Traynor for a unanimous court in *Reich* v. *Purcell* (1967) 67 Cal.2d 551. . . , we renounced the prior rule, adhered to by courts for many years, that in tort actions the law of the place of the wrong was the applicable law in a California forum regardless of the issues before the court." (*Hurtado* v. *Superior Court* (1974) 11 Cal.3d 574, 579 [114 Cal.Rptr. 106, 522 P.2d 666].) ■ Thus, after *Reich*, "California choice of law rules rest on an analysis of the respective interests of the states or countries involved; the so-called 'governmental interest' approach, the objective of which is ' "to determine the law that most appropriately applies to the issue involved." [Citation.]' " (*Corrigan* v. *Bjork Shiley Corp.* (1986) 182 Cal.App.3d 166, 179 [227 Cal.Rptr. 247].)

"Analysis of a choice of law question proceeds in three steps: (1) determination of whether the potentially concerned states have different laws, (2) consideration of whether each of the states has an interest in having its law applied to the case, and (3) if the laws are different and each has an interest in having its law applied (a 'true' conflict), selection of which state's law to apply by determining which state's interests would be more impaired if its policy were subordinated to the policy of the other state." (*North American Asbestos Corp.* v. *Superior Court* (1986) 180 Cal.App.3d 902, 905 [225 Cal.Rptr. 877].)

" '[G]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state. In such event

he must demonstrate that the latter rule of decision will further the interest of the foreign state and therefore that it is an appropriate one for the forum to apply to the case before it. [Citations.]' " (*Clothesrigger, Inc.* v. *GTE Corp.* (1987) 191 Cal.App.3d 605, 614 [236 Cal.Rptr. 605].)

■ "Ordinarily the failure to preserve a point below constitutes a waiver of the point. [Citation.] This rule is rooted in the fundamental nature of our adversarial system . . . . ' "In the hurry of the trial many things may be, and are, overlooked which could readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them." ' . . . [¶] The same policy underlies the principles of 'theory of the trial.' 'A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing party.' [Citation.] The principles of 'theory of the trial' apply to motions . . . ." (*North Coast Business Park* v. *Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 28-29 [21 Cal.Rptr.2d 104].)

■ Although an appellate court, in its discretion may allow an appellant to raise a new issue of law on appeal, appellate courts " 'are more inclined to consider such tardily raised legal issues where the public interest or public policy is involved.' " (*Resolution Trust Corp.* v. *Winslow* (1992) 9 Cal.App.4th 1799, 1810 [12 Cal.Rptr.2d 510].) However, if the new theory contemplates a factual situation the consequences of which are open to controversy and were not put in issue or presented at trial the opposing party should not be required to defend against it on appeal. (*Richmond* v. *Dart Industries, Inc.* (1987) 196 Cal.App.3d 869, 879 [242 Cal.Rptr. 184].)

■ It is clear that appellants in this case asked the trial court to apply German law on the basis of *Gallegos*. Inasmuch as we can affirm the trial court's denial of the motion to apply German law on the ground that *Gallegos* was not the controlling law and that the defendants failed to meet their burden of establishing their motion had merit on some other ground, it does not matter that the trial court may have applied *Gallegos* and reached the same result. After all, we review the trial court's ruling and not its particular course of reasoning.

Appellants also now seek to fault the trial court for failing to perform a proper governmental interest analysis, when appellants never asked the trial court to apply such principles. Accordingly, appellants never cited *Reich* or its progeny to the trial court, and failed to introduce sufficient evidence addressed to any issues under the governmental interest analysis to establish

that a true conflict of laws exists with respect to the facts of the instant case, and that Germany has any interest in applying German law to the instant dispute. We cannot fault the trial court for failing to address issues that were not presented to it. Accordingly, appellants fail to establish any trial court error in its ruling on the oral motion before it.[4]

Were this an appropriate case to exercise our discretion to address the conflict of law issue de novo, we would still conclude that appellants are not entitled to prevail on this issue. Even in their briefs on appeal, appellants fail to adequately establish that the governmental interest approach requires the application of German law. Contrary to their earlier claims, appellants now do not claim that Sommer does not possess a claim for damages for defamation under German law; rather, appellants now contend that she would not have been able to recover the elements of presumed and punitive damages. However, it is unclear from the portions of German court decisions apparently translated into English in their briefs, whether the references to "pain-and-suffering" damages and damages for "economic harm" would encompass similar types of damages permitted under California law. More-over, the reference to a German court decision which refused to enforce a California civil judgment awarding punitive damages for sexual assault by a defendant who moved to Germany after being released from prison is clearly distinguishable from the instant case, which does not involve any criminal conviction and a related civil judgment for damages. The snippets and portions of German case law cited by appellants are simply not adequate for us to make any meaningful conclusions regarding the result of applying German law to the instant case. Thus, we conclude that appellants fail, even now, to establish that a true conflict exists between German and California law.[5]

---

[4]As stated by one court, "There is nothing shocking about these rules [of waiver and invited error]. They are consistent with the adversary system's appreciation that lawyers in civil litigation must be given adequate breathing room to select whatever trial strategies they deem appropriate. Absent the need for the same constitutional protections afforded to defendants in criminal cases, there is considerable judicial deference to attorney creativity in civil cases. . . . [¶] Although this laissez faire judicial attitude towards the trial lawyer increases the probability that the outcome in most cases is correct, it also involves the risk that the lawyer's gamble may go awry with a skewed or ambiguous result. Absent unusual circumstances in spite of this risk, appellate courts generally are unwilling to second guess the tactical choices made by counsel during trial. Thus where a deliberate trial strategy results in an outcome disappointing to the advocate, the lawyer may not use that tactical decision as the basis to claim prejudicial error." (*Mesecher* v. *County of San Diego* (1992) 9 Cal.App.4th 1677, 1686 [12 Cal.Rptr.2d 279].)

[5]Appellants do not attach copies of the German cases or treatises cited in their briefs on appeal, nor do they request us to take judicial notice of any German statutes or case law, or even to perform our own research. Accordingly, we base our conclusions only on the parties' briefs. We do not intend our decision to reflect any conclusions as to German law, as the

Moreover, appellants failed below, and still fail here, adequately to address the issue of Germany's interest in applying its law to the instant dispute, involving parties who are all residents of the United States, and involving defamatory statements by Von Anhalt in Los Angeles to a "Bild" correspondent also in Los Angeles. Assuming arguendo that there is a true conflict of laws in this case, one court has remarked that "Although the two potentially concerned states have different laws, there is still no problem in choosing the applicable rule of law where only one of the states has an interest in having its law applied. [Citations.] 'When one of two states related to a case has a legitimate interest in the application of its law and policy and the other has none, there is no real problem; clearly the law of the interested state should be applied.' " (*Hurtado* v. *Superior Court, supra,* 11 Cal.3d at p. 580.) Appellants fail to cite any authority addressing the issue of whether, or to what extent, Germany has an interest in the instant dispute. Hence, we are unable to conclude that appellants should prevail under the governmental interest analysis.

Inasmuch as there has been a trial on the merits, we also note that appellants have not established prejudicial error. In other words, assuming arguendo that it was error not to apply German law, appellants fail to establish that under German law it would have been more probable than not that the judgment would have been any different. For all of the foregoing reasons, we find to be without merit appellants' contention that German law applies to the instant case.

## II

### No Excessive Damages

Appellants contend that the awards of presumed and punitive damages are excessive. Appellants claim that in light of the fact that there were no special damages in this case, as acknowledged by Sommer's counsel below, the award of general damages is excessive. As to the award of punitive damages, appellants contend that the punitive damage award falls if the compensatory damage award is vacated; further, appellants argue that punitive damage awards in defamation cases "are routinely reduced on appeal, especially where the actual injury is small."

(5) "It is well settled that damages are excessive only where the recovery is so grossly disproportionate to the injury that the award may be

---

information we have been provided by appellants is clearly inadequate to reach any such conclusions. Thus, our decision is based on the conclusion that appellants have failed to meet their burden to establish prejudicial error.

presumed to have been the result of passion or prejudice. Then the reviewing court must act. [Citations.] The reviewing court does not act de novo, however. As we have observed, the trial court's determination of whether damages were excessive 'is entitled to great weight' because it is bound by the 'more demanding test of weighing conflicting evidence than our standard of review under the substantial evidence rule. . . .' " (*Fortman* v. *Hemco, Inc.* (1989) 211 Cal.App.3d 241, 259 [259 Cal.Rptr. 311].) All presumptions favor the trial court's determination and we review the record in the light most favorable to the judgment. (*Ibid.*)

■ In light of the foregoing rules, we reject appellants' attacks on the substantiality of the evidence to support the damage award, as they are nothing more than challenges to the credibility of the witnesses and the inferences to be drawn from their testimony. For example, appellants claim that the "sole evidence offered to show actual harm to reputation consisted of three fan letters that Plaintiff received in her home in Germany." Our record shows that Sommer's mother, who was living in the home in Germany, received about 200 fan letters, although she kept only several; the fact that some fans offered to help Sommer indicates that fans believed the defamatory statements were true, from which the jury could infer actual damage to Sommer's reputation. There is nothing in our record to support appellants' assertion that the fan letters were admitted for the limited purpose of showing Sommer's state of mind. Further, appellants attack the testimony of publicist Richard Guttman as "theoretical" and speculative, but such attacks are merely attacks on his credibility. Guttman testified unequivocally that the articles were damaging to Sommer's reputation as an actress and were "terminal to her career." Thus, our record contains substantial evidence of "damages that necessarily result from the publication of defamatory matter," and include "compensation for loss of reputation, shame, mortification, and hurt feeling." (See BAJI No. 7.10.1 (1992 rev.).) Accordingly, on the instant record, we conclude that there is no indication that the jury award was grossly disproportionate to the injury or the result of passion or prejudice.

■ With respect to punitive damages, appellants fail to establish that there was not clear and convincing evidence to support the jury's finding of malice.[6] Both appellants admitted at trial that they had no knowledge of the true age of Sommer or of the details of her financial condition. Although Gabor denied making the statements attributed to her in the press, and Von Anhalt admitted some statements but challenged their context, the jury obviously believed the testimony of the journalists and concluded that they

---

[6]Appellants do not contend on appeal that the awards of punitive damages were excessive in relation to their respective financial conditions.

in fact made the false statements with malice. Appellants thus fail to establish that the awards of punitive damages were excessive or the result of passion and prejudice.

## III

### JURY INSTRUCTIONS

A. *Failure to Instruct with BAJI No. 14.60.*

■ Appellants claim the court erred in refusing their request to instruct pursuant to BAJI No. 14.60, which would have essentially told the jury that they were not permitted to award speculative damages, meaning future loss or harm which is conjectural or not reasonably certain. Appellants contend that the court's refusal to give BAJI No. 14.60 "meant that the jury was not told that Civil Code section 3283 expressly limits any award of future damages to injury that is *reasonably certain* to result." (Original italics.)

As pointed out by respondent, the jury in this case was not expressly told that it could, or could not, award future damages. Rather, the jury was instructed pursuant to BAJI No. 7.10 and the 1992 version of BAJI No. 7.10.1. BAJI No. 7.10, regarding general or compensatory damages, essentially told the jury that in determining the amount of general damages, it could consider, but was not limited to, the extent of publicity given to the libel or slander, plaintiff's good name, reputation, and the loss thereof, plaintiff's shame, mortification, injured feelings and mental suffering, her prominence in the community, and her professional or business standing in the community where she lives.

Pursuant to BAJI No. 7.10.1 (1992 rev.), the jury was instructed that if it found that defendant published matter that was defamatory on its face and it found by clear and convincing evidence that defendant knew the statement was false or published it in reckless disregard of whether it was false, then the jury "also may award plaintiff presumed general damages." Presumed damages "are those damages that necessarily result from the publication of defamatory matter and are presumed to exist. They include reasonable compensation for loss of reputation, shame, mortification, and hurt feeling. No definite standard or method of calculation is prescribed by law by which to fix reasonable compensation for presumed damages, and no evidence of actual harm is required. Nor is the opinion of any witness required as to the amount of such reasonable compensation. In making an award for presumed damages, you shall exercise your authority with calm and reasonable judgment and the damages you fix shall be just and reasonable in the light of the

evidence. You may in the exercise of your discretion award nominal damages only, namely an insignificant sum such as one dollar."

We agree with appellants' argument that *Pouchan* v. *Godeau* (1914) 167 Cal. 692 [140 P. 952] is directly on point; however, it does not support their argument, but rather supports the conclusion that the instant instructions constitute substantial compliance with Civil Code section 3283.

In *Pouchan,* the court concluded reversible error occurred because the jury was instructed so as to permit them to allow damages, " 'both for . . . *present and future injury* to the character of plaintiff which the uttering of the words *was calculated* to inflict.' " (167 Cal. at p. 696, original italics.) The court held that the word "calculated" may mean either likely or intended, and does not limit the damages for future injury to character " 'to such as are certain to result, but permits damages either for such injury as is likely to result from the uttering of the slanderous words, or such as was intended.' " (*Ibid.*) Accordingly, the foregoing instruction was held not to conform to Civil Code section 3283. However, the court in *Pouchan* also distinguished the instruction therein with that in another case, which upheld an instruction with the limiting term "necessarily," which also appears in BAJI No. 7.10.1. "In *Ryan* v. *Oakland Gas, Light & Heat Co.,* 21 Cal.App. [14,] 23 [130 P. 693], the instruction criticized by counsel and upheld by the court was one by which the jury was told that compensation might be awarded for 'pain suffered or to be *necessarily* suffered from the injury,'—clearly a substantial compliance with section 3283 of the Civil Code." (167 Cal. at p. 697.)

Accordingly, applying principles set out in *Pouchan* to this case, we conclude that the instant instruction, which limits damages to "those damages that necessarily result from the publication of defamatory matter," constitutes substantial compliance with section 3283. Thus, the instant instructions, "if obeyed, did not allow the jurors to 'enter the realm of speculation' regarding future suffering." (167 Cal. at p. 697.)

B. *BAJI No. 7.09.*

Appellants contend that the trial court erred in instructing the jury pursuant to BAJI No. 7.09, that certain of their statements, if determined by the jury to be libel, were defamatory on their face. They claim that the defamatory meaning of the statements was ambiguous and therefore the issue was one of fact that should have been left to the jury to decide.[7] As a matter of law, we conclude that the trial court correctly determined the

---

[7]In pertinent part, the instruction stated: "The statements allegedly made by Defendant [Gabor] that 'Plaintiff is broke; Plaintiff supports herself by making and selling pullover

statements set out in the instruction were unambiguous and defamatory on their face as a matter of law. (See fn. 7, *ante.*) Those statements are not reasonably susceptible to an innocent meaning, and clearly meet the definition of libel set out in the instructions as exposing Sommer to "hatred, contempt, ridicule, or obloquy, or which causes the person to be shunned, or avoided, or which has a tendency to injure the person in his or her occupation." (BAJI No. 7.00.) Inasmuch as appellants fail to cite any authority to establish that the foregoing statements were ambiguous or capable of an innocent meaning, they fail to establish any error with respect to BAJI No. 7.09.

## C. BAJI No. 7.04.

Appellants complain that the trial court gave a superseded version of BAJI No. 7.04, dealing with the issue of whether the publication was made by defendant with knowledge that it was false or with reckless disregard for the truth. Appellants point out that the former instruction characterized the issue as a "privilege," which language has been removed from the current version of the instruction; further, the current version sets out the "knowledge of falsity or reckless disregard" element along with the other elements as to which the plaintiff has the burden of proof. According to appellants, the current version more clearly sets out the elements which a plaintiff must prove.

When viewed as a whole, the instructions given as to the knowledge element were correct and not confusing. The court in this case gave a

---

sweaters; Plaintiff had to sell her house in Hollywood; Plaintiff lives in the worst area in Los Angeles; Plaintiff spends her time or hangs out only in the sleaziest bars; and no one wants anything to do with the Plaintiff' are defamatory on their face, if essentially untrue, if the statements were libel as the Court has defined the term."

As to Von Anhalt, the instruction stated: "The statements allegedly made by Defendant Frederic Von Anhalt that 'Sommer is lying about her age; she is not 48, but 62'; that 'We have the same suppliers and they tell us that bills remain unpaid. In Hollywood nobody recognizes her on the street anymore and she cannot afford the $500.00 ticket for a benefit party'; that 'in Germany nobody knows her anymore'; and 'I had seen her about 3 months ago, she has hardly any hair left and looks like a 100 year-old grandmother' are defamatory on their face if essentially untrue, if the statements were libel as the Court has defined the term."

In this case, it was necessary to explain the distinction between defamation and defamation per se to the jury because in the event the jury found the statements to be *slander* and not libel, the question of whether the statements were defamation per se was a factual issue left to the jury. It was also a factual issue for the jury as to whether certain of Von Anhalt's statements were defamatory in the first instance. Sommer's counsel admitted at trial that she could not prove special damages. The jury was thus instructed that "If a statement is not defamatory on its face, but nonetheless under all the circumstances is defamatory, plaintiff having failed to establish that she has sustained special damages cannot recover general damages." This latter instruction is not challenged by appellants.

modified version of BAJI Nos. 2.60 and 2.62, which clearly set out all the elements which Sommer must prove, including the element of the defendant's knowledge of falsity, and the corresponding burdens of proof. This latter instruction indeed provided the clear road map and structure for the case. The fact that such structure was not provided in the context of BAJI No. 7.04, but in the burden of proof instructions is of no significance. Moreover, appellants do not argue or establish with any authority that the reference to "privilege" in the instruction altered the burden of proof or the factual components of the elements Sommer had to prove. Accordingly, we conclude that appellants fail to establish any error with respect to BAJI No. 7.04 or instruction on the element of the defendant's knowledge of falsity or reckless disregard for the truth.

D. *Instructions as a Whole.*

Appellants' generalized attack on the totality of the instructions as confusing is without merit. Although complicated, the instructions, including those which appellants have singled out above, have not been shown to be erroneous or misleading in any respect. Appellants complain that the trial court erroneously modified language in 7.00.1 so as to state that a statement is not defamatory unless it conveys to the recipient "an assertion of fact that can be proven true or false." The unmodified version contains the language "a provably false assertion of a fact or facts." Inasmuch as we fail to discern any meaningful distinction between the two versions, we cannot conclude the modification was erroneous.

Without merit is appellants' claim that the court erred in removing the second paragraph of BAJI No. 7.07, dealing with the plaintiff's burden of establishing the falsity of the statements; the same information was conveyed to the jury in the modified versions of BAJI Nos. 2.60 and 2.62.

Finally, appellants suggest that with respect to Von Anhalt, BAJI No. 7.09 and the modified version of No. 7.00.1 are inconsistent because the jury was told in No. 7.09 that certain of his statements were defamatory on their face, "if essentially untrue, if the statements were libel," and in No. 7.00.1, they were asked to determine whether three specific statements conveyed assertions of fact that can be proven true or false.[8] Taken as a whole the instructions can only reasonably be interpreted as permitting the jury first to determine whether the three statements were defamatory in the first instance as conveying to the recipient an assertion of fact that can be proven true or

---

[8]The three statements set out in the modified version of 7.00.1 were "1. In Hollywood, nobody recognizes [Sommer] on the street anymore. [¶] 2. In Germany, nobody knows [Sommer] anymore. [¶] 3. [Sommer] looks like a 100-year-old grandmother."

false. If so, then the jury was told that if the statements were found to constitute libel, and to be untrue, then the statement was defamatory per se. We thus reject appellants' claims that the foregoing instructions were hopelessly confusing and provided insufficient guidance to the jury.

IV

### Whether Statements Were Nonactionable Opinions

 Without merit is appellants' contention that all of the statements attributed to Gabor are subjective opinions and not provably false as a matter of law. Only two particular statements of Gabor are addressed in the briefs: the statement that Sommer hangs out in sleazy bars, and the statement that she lives in the worst part of town. Appellants claim that "sleazy" and "worst" express subjective opinions that are not actionable. However, the import of Gabor's statements was not so limited. The Freizeit Revue article attributed to Gabor the statements, inter alia, that "She is broke, had to sell her house in Hollywood, now lives in the worst section, hangs out only in the seediest bars. She now lives from handknit pullovers that she sells for 150 dollars." The evidence in this case established that Sommer did not frequent bars of whatever nature, was not broke, did not have to sell her house in Hollywood, and did not move, whether to the "best" or "worst" part of town. Thus, the statements were indeed proven to be false in their broad sense, so that it did not matter what kind of bars were described or to what part of town she was alleged to have moved. Thus, taken in context, the statements were defamatory not because of the adjectives used in the statements, but because even without the adjectives, they attributed characteristics to Sommer's lifestyle which exposed her to contempt, ridicule and disgrace. Thus, Gabor has not established any of the statements attributed to her were not actionable as a matter of law.

Von Anhalt contends that the three statements which the jury impliedly determined to be provably false are not defamatory as a matter of law because they express only a subjective judgment. (See fn. 8, *ante.*) This claim is nothing more than an attack on the sufficiency of the evidence to support factual determinations made by the jury. Sufficient evidence supports the jury's implied findings that the three statements can be proven true or false, and indeed, were proven false by Sommer's testimony: In 1990, she received fan mail sent to her home in Germany, she was recognized in Germany, in 1990 she was recognized on the street in Hollywood and asked for autographs, she was 49 years old, was not bald, and did not have short hair. Von Anhalt failed to object to the foregoing testimony, and even now fails to establish that it was erroneously admitted. Accordingly, he fails to

establish that his statements were nonactionable statements of opinion or subjective judgment.

## V

### ADMISSION OF EVIDENCE OF EMOTIONAL DISTRESS SUFFERED BY SOMMER'S MOTHER

■■ Appellants contend that the trial court erred in admitting "inadmissible and inflammatory 'damage' testimony from [Sommer] regarding her elderly mother's emotional distress and deteriorating health and her own resulting reaction."

At trial, Sommer's counsel asked her if she had an occasion to see how the publication of the articles affected her mother, living in Germany. The court overruled an objection on the ground of relevancy. Sommer then testified that she did see how the publication affected her mother. Her counsel then asked "how did this make you feel when you made these observations?" Sommer responded, "It is probably for me one of the most devastating things to see anything hurt that lives . . . . [¶] Now, to see my mother hurt, my mother is the only member of the family I have got. I have no other brothers or sisters, unfortunately. My dad passed away when I was 14 years old. So if anything happens to her—that is, of course, very devastating and anything that deteriorates her health like stressful situations like this or at that time, that furthers deterioration of her already not-so-wonderful health is of course incredibly important to me."[9]

Although we acknowledge that it is difficult to posit a theory of relevancy of the foregoing evidence, we conclude that any error in admitting it was not

---

[9]The answer is curious because it does not purport to describe the actual impact of the articles on her mother, but only Sommer's concern for anything that would deteriorate her mother's health "like stressful situations like this." Sommer was clearly trying to answer the question posed to her about how she, Sommer, felt, when observing the impact of the articles on her mother. As to this latter point, there was no objection by defendants. Because the focus of the question was *Sommer's feelings* when observing her mother's reaction, no evidence was ever elicited from Sommer clarifying exactly what the impact of the articles was on her mother's health, and our record is unclear on this point. We do acknowledge, however, that the jury could have inferred from the testimony that the articles were stressful for Sommer's mother and that the articles in some manner further deteriorated her already "not-so-wonderful health." Because the issues of the impact on Sommer's mother and Sommer's feelings about that impact are different, yet intertwined, we question whether appellants have adequately preserved this point for appeal because there was no objection to the testimony dealing with Sommer's own reactions and feelings, just to the question pertaining to the effect of the articles on her mother.

Appellants appear to concede in their brief that " 'a sharp distinction is to be drawn between the plaintiff's natural apprehension of the effects of the defamation on his or her

prejudicial under the circumstances of this case. There was substantial evidence to support a determination by the jury in Sommer's favor and it is doubtful that the evidence pertaining to the effect of the articles on Sommer's mother constituted a serious detriment to appellants. We cannot conclude that this brief testimony stirred the passions of the jury or was inflammatory in any manner. In light of the record in this case, we conclude that it is not reasonably probable that a verdict more favorable to appellants would have been reached absent the foregoing evidence. (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 554 [208 Cal.Rptr. 874, 691 P.2d 630].)

## DISPOSITION

The judgment is affirmed. Respondent is entitled to her costs on appeal.

Johnson, J., and Woods (Fred), J., concurred.

Appellants' petition for review by the Supreme Court was denied February 29, 1996.

---

family, which is a proximate result of the defamation, and the actual suffering of the family and its reflex effect on the plaintiff, which is not a proximate result of the defamation.' " Thus, appellants fail to establish the evidence pertaining to Sommer's own apprehension of the effect of the defamation on her mother is irrelevant.